The CITY OF BRUNSWICK, GEORGIA, Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

Civ. A. No. 285–142.

United States District Court, S.D. Georgia, Brunswick Division.

May 20, 1987.

Eugene Highsmith, Brunswick, Ga., David F. Walbert, Atlanta, Ga., for plaintiff.

Arthur R. Goldberg and Drake Cutini, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## ORDER

ALAIMO, Chief Judge.

Plaintiff, the City of Brunswick, Georgia ("Brunswick"), seeks to recover attorney fees, costs and other expenses incurred in this litigation against the United States, the Director of the Federal Emergency Management Agency and the Administrator of the Federal Insurance Administration as defendants (collectively, "FEMA"). Plaintiff contends that it is eligible for an award of such costs under the Equal Access to Justice Act, 28 U.S.C. § 2412 ("EAJA"), other relevant statutes and at common law. In sum, Brunswick requests an award of $477.934.11. Defendant maintains that plaintiff is not eligible for *any* award under the EAJA but that, if any award is made under the EAJA or other statutes, it should be substantially reduced. The Court finds that Brunswick is entitled to an award in the amount of $312,876.10 for attorney fees and other expenses, and $11,616.05 for costs.

## FACTUAL BACKGROUND

This case began as a technical dispute over "base flood elevations" and culminated in a legal grudge-match over attorney fees. An historical overview is necessary

to set the dispute in its current context. The lawsuit arose out of Brunswick's challenge to FEMA's determination of the flood level figures used in calculating Brunswick's eligibility for federally subsidized flood insurance.

A comprehensive statutory scheme governs the availability of federally subsidized flood insurance. After completing a study on the feasibility of a national program of flood insurance, Congress enacted the National Flood Insurance Act of 1968, Pub.L. 90–448, 82 Stat. 572 (1968), and the Flood Disaster Protection Act of 1973, Pub.L. 93–234, 87 Stat. 979 (1973), *codified as amended,* 42 U.S.C. § 4001 *et seq.* (1982). This legislation aimed to combine the incentive of federally subsidized flood insurance with the requirement that communities receiving such insurance carefully control the development of land historically likely to be visited by floods. In addition, the purchase of such insurance is made a precondition of receiving federal assistance for any construction in certain high-risk areas.

Brunswick sought to be included in the National Flood Insurance Program in 1974, thereby triggering the availability of flood insurance to property owners at subsidized rates. 42 U.S.C. §§ 4011, 4012(c). At the same time, Brunswick's application set into motion FEMA's performance of a flood insurance study ("FIS") and the subsequent creation of a flood insurance rate map ("FIRM"). 42 U.S.C. §§ 4101, 4104.

The purpose of the FIS is to identify "flood plains," such as "coastal areas in the United States which have special flood hazards," and to establish "flood risk zones" and "make estimates with regard to probable flood-caused loss" for these zones. The results of the FIS are then "translated" onto a FIRM, which is an official map of the community delineating the "special hazard areas and risk premium zones applicable to the community." 44 C.F.R. § 59.1 (1986). In order to calculate actuarially sound insurance rates for flood-risk zones, FEMA makes reference to a variable called the "base flood elevation" ("BFE"), which is the estimated water level of a "flood having a one percent chance of being equalled or exceeded in any given year." The BFE, therefore, has an impact both on the insurance rates to be charged and on the kinds and costs of construction to be permitted in flood-risk zones.

Following the promulgation of a final FIRM, a participating community must enact a "flood plain management" ordinance to regulate the development of new or improved structures in high-risk areas. 42 U.S.C. §§ 4012(c), 4022, 4102. If the community fails to establish a local ordinance meeting the minimum safety standards set by FEMA, it will lose the benefit of subsidized insurance. 44 C.F.R. § 60.3. A prime example of those safety standards is the requirement that new or substantially improved buildings be erected at or above the BFE's shown on the FIRM. 44 C.F.R. § 60.3(c).

FEMA employed a private engineering firm in Virginia—Camp, Dresser & McKee ("CDM")—to perform the FIS for Brunswick and the surrounding tri-county area. On December 19, 1984, FEMA notified Brunswick by certified letter that the final FIRM would go into effect on June 19, 1985, and that the City had six months to adopt appropriate ordinances regulating development in the flood-risk areas. Brunswick neglected to respond to FEMA's notice of December 1984 until May 1, 1985, apparently because of an inadvertent failure to read the notice until that time. On May 1, 1985, the City requested a nine-month extension of the FIRM's effective date and asserted both that the FIS was technically deficient and that the FIRM should not be imposed without FEMA's first conducting an environmental impact statement ("EIS") for the Brunswick area. FEMA refused to grant an extension, but invited Brunswick to submit additional flood data, which the City did. FEMA also stated its belief that an EIS was not required prior to the implementation of a FIRM.

In order to avoid being terminated from the flood insurance program, Brunswick imposed an indefinite moratorium on building permits within the high-risk flood areas of the FIRM.

On July 16, 1985, Brunswick filed this suit against FEMA seeking to enjoin the

agency from implementing the FIRM and requesting declaratory relief on the basis of the following contentions: (1) that the proposed flood elevations were hopelessly inaccurate; (2) that FEMA was obligated to perform a site-specific EIS before implementing a FIRM; (3) that FEMA violated its own regulations by failing to conduct notice-and-comment rule making on the methodology to be used in performing a FIS; and (4) that FEMA unlawfully delegated critical fact-finding functions to a private entity (CDM) without exercising meaningful supervision over its work.

On August 16, 1985, the Court approved a discovery plan worked out by the parties in connection with Brunswick's request for a preliminary injunction. Discovery proceeded during the following months, with a variety of problems arising which required the repeated intervention of the Court. Each party filed proposed findings of fact and conclusions of law. By late December of 1985, the parties were earnestly engaged in settlement discussions, and a tentative trial date had been set for January 2, 1986. By Order of January 9, 1986, having reviewed FEMA's motion for summary judgment, the Court dismissed Brunswick's count seeking judicial review of FEMA's flood insurance rate map because Brunswick had failed to apply for review within the statutory time limit set by 42 U.S.C. § 4104(g), which requires that final agency determinations be appealed within 60 days. The Court, therefore, dismissed the count seeking judicial review of agency action from the complaint for lack of subject matter jurisdiction. At oral argument, the Court had previously denied FEMA's motion for summary judgment as to the remainder of Brunswick's complaint, which survived to be decided at trial.

On January 29, 1986, the parties reached a settlement stipulation which the Court approved. In substance, the settlement agreement provided that the parties would submit any unresolved issues regarding FEMA's performance of the FIS to an arbitration panel of experts. The panel would decide issues submitted to it by the City and its decision would be accepted as final. The agreement also provided a method for the selection of arbitrators. FEMA agreed to modify the FIRM if the arbitration panel reached new base flood elevations. Any new FIRM reflecting the panel's new base flood elevations would become effective by Order of the Court. Brunswick and FEMA agreed to bear the costs of implementing the settlement agreement equally, but Brunswick also promised to make application for an award of attorney fees and costs within 30 days of the conclusion of the settlement process. FEMA did not concede that Brunswick was entitled to any such award.

By March 21, 1986, the arbitration panel was selected and ready to begin deliberations. The Court met with the arbitrators on that date and discussed with them the nature of their duties. In the conference, the Court clearly defined the scope of their inquiry. The Court stated: "The main object is to see that the flood elevation is correct ... I want you to come up with the BFE. ... That is what this is all about." The Court's colloquy with the arbitrators sheds light on the view the arbitrators themselves took of their duty. Richard Tomasello, an arbitrator, suggested that their most difficult task would be to determine the effect on the final BFE if they should discover that "some element of the study that was done originally was totally in error...."

On June 12, 1986, the arbitration panel submitted its report, which found a variety of errors in FEMA's methodology requiring the establishment of new BFE's and leading to the issuance of a new FIRM by FEMA. Although FEMA at first objected to the panel's findings, it later withdrew its objection and issued a new FIRM on October 24, 1986. The Court entered an Order making the new FIRM effective on October 30, 1986.

On November 14, 1986, Brunswick filed a motion stating that it had substantially received the relief it sought and requesting an award of costs, expenses and attorney fees under a variety of statutes and equitable theories, including 28 U.S.C. § 2412, the EAJA. The motion contained itemized estimates of each of these costs, and stated that the requested fees and expenses

would be set forth more specifically in a supplement, as allowed under Local Rule 11.2(c). Local Rule 11 provides that motions for costs must be filed by a prevailing party within 30 days after a final judgment. Rule 11.2(c) states that the motion:

shall specify the judgment and the statute or other grounds on the basis of which entitlement to the award is claimed and shall state the amount (or provide a fair estimate of the approximate amount) of the fees and expenses sought. Within 30 days (or such other period as the Court may prescribe) after filing the motion, the movant shall file and serve a detailed specification and itemization of the requested award, with appropriate affidavits and other supporting documentation.

Brunswick filed a supplement to its motion for attorney fees, costs and expenses on December 18, 1986. After FEMA's initial attempts to bifurcate the case and to interpose threshold defenses were rejected by the Court, FEMA's full response and memorandum in opposition to the award of fees were filed on February 18, 1987. Since that time, each party has filed a variety of replies and counter-replies, whose volume and complexity have rivaled that of the proceedings on the merits. The Court heard oral argument on the fee petition on April 28, 1987.

## DISCUSSION

### I. Attorney Fees and Other Expenses Under the EAJA

#### (A) Threshold Requirements

The EAJA sets eligibility requirements for parties seeking to recover attorney fees, costs and other expenses under 28 U.S.C. § 2412. For example, § 2412(d)(1)(A) provides:

Except as otherwise specifically provided by statute, a court shall award to a prevailing party ... fees and other expenses ... incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of the action, unless the court finds that the position of the United States was substantially justified....

Thus, no award is available under the EAJA as a threshold matter unless the party seeking the award "prevailed" in the underlying litigation.

Section 2412(d)(1)(B) also prescribes certain requirements which an EAJA applicant must follow. First, the party must submit its application for fees and other expenses within 30 days of a "final judgment." Second, § 2412(d)(1)(B) describes the substantive requirements governing the content of the application. Specifically, the application must show:

—that the party is a prevailing party and is eligible to receive an award under this subsection, and

—the amount sought, including an itemized statement from any attorney or expert witness representing or appearing on behalf of the party stating the actual time expended and the rate at which fees and other expenses are computed.

This section further requires that the award-seeking party "allege that the position of the United States was not substantially justified." The issue of "whether or not the position of the United States was substantially justified shall be determined on the basis of the record ... which is made in the civil action for which fees and other expenses are sought."

In summary, under § 2412(d)(1)(B), an applicant must meet the threshold requirement of filing his application in a timely manner and ensuring that the application contains the elements described above.

Other examples of threshold eligibility requirements may be found in the definitional component of the EAJA, codified in § 2412(d)(2). For instance, § 2412(d)(2)(B) defines the term "party" as "any ... unit of local government or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed...." This definition precludes any local governments with a "net worth" in excess of $7,000,000 from seeking attorney fees or other expenses under the EAJA.

From the preceding review of the statute, it is evident that the EAJA imposes at least three threshold requirements upon a

party seeking an award of fees and other expenses: (1) the applicant must be a prevailing party; (2) the application must be timely filed within 30 days of a final judgment and must also contain certain information; (3) the applicant, if a unit of local government, must have a net worth of less than $7,000,000 at the time the underlying suit was filed. In contesting Brunswick's eligibility for an award under the EAJA, FEMA asserts that Brunswick failed to meet each of these threshold requirements. Accordingly, the Court will consider each contention in turn.

### (1) Prevailing Party

■ The law in this Circuit is unmistakably clear that a party "prevails" for the purposes of the EAJA when "he or she has received substantially the relief requested or has been successful on the central issue." *Martin v. Heckler*, 773 F.2d 1145, 1149 (11th Cir.1985) (en banc); *quoting Watkins v. Mobile Housing Board*, 632 F.2d 565, 567 (5th Cir. Unit B, 1980). Stated another way, the prevailing-party test is whether "plaintiff's lawsuit was a catalyst motivating defendants to provide the primary relief sought in a manner desired by litigation." *Martin, supra, quoting Robinson v. Kimbrough*, 652 F.2d 458, 465 (5th Cir.1981). That a party succeeds in obtaining relief as a result of a consent judgment, an out-of-court settlement or a voluntary cessation of the unlawful conduct does not prevent that litigant from being considered a prevailing party. *Doe v. Busbee*, 684 F.2d 1375, 1379 (11th Cir. 1982).

Although the *Martin* Court construed the term "prevailing party" as it is found in both the EAJA and the Civil Rights Attorneys Fee Awards Act, 42 U.S.C. § 1988, the court treated the terms as legally synonymous. District courts applying *Martin* have done the same. *U.S. v. Certain Real Property Located at 4880 S.E. Dixie Highway*, 628 F.Supp. 1467, 1469 (S.D.Fla.1986) (applying the *Martin* prevailing-party test to an EAJA litigant); *York v. Alabama State Board of Education*, 631 F.Supp. 78,83 (M.D.Ala.1986) (applying *Martin* to § 1988 litigants). Moreover, this Circuit has specifically held

that a party who secures a favorable settlement or consent decree from the United States qualifies as a prevailing party under the EAJA alone. *National Treasury Employees Union v. I.R.S.*, 735 F.2d 1277, 1278 (11th Cir.1984).

FEMA contends in this case that Brunswick did "not receive 'substantially the relief requested,' nor was it successful 'on the central issue,' nor was its lawsuit a catalyst in obtaining 'the primary relief sought.'" For the following reasons, the Court disagrees.

■ Brunswick brought this lawsuit to delay and ultimately prevent the implementation of what it considered an inaccurate FIRM; the City's apparent goal was to force a revision of the FIRM based on what it considered more accurate information. As a result of a court-supervised settlement and arbitration process, the original FIRM *was* indeed found to contain inaccuracies and was replaced by a new FIRM which Brunswick alleges is more in line with the City's needs. Although the Court lacks the scientific expertise to discern whether the altered base flood elevations in the revised FIRM are technically without flaw, it is manifest in the opinion of the Court that this lawsuit *was* a "catalyst motivating defendants to provide the primary relief sought in a manner desired by litigation." *Robinson v. Kimbrough, supra* at 465. It was the lawsuit which induced FEMA to accept binding arbitration and a reconsideration of the FIRM, and arbitration which resulted in the implementation of a FIRM more favorable to plaintiff. Under these circumstances, Brunswick is a prevailing party under the EAJA.

### (2) Timely Application

Plaintiff's motion for an award of attorney fees, costs and other expenses was filed on November 14, 1986. The motion alleged that Brunswick was the prevailing party in this case, that final judgment was entered on October 30, 1986, by the Court's Order approving the final FIRM and that Brunswick was entitled to an award of costs under the EAJA and other statutes. Plaintiff's motion also contained an item-

ized list of estimated costs and expenses, and stated that the motion was filed in conformance to this Court's Local Rule 11.-2(c), which allows parties seeking attorney fees to provide a fair estimate of the fees and expenses sought and requires the movant to file "a detailed specification and itemization of the requested award within 30 days of filing the original motion."

Throughout the remaining stages of this fee litigation, even after the Court held in its Order of February 3, 1987, that the fee application *was* timely filed, the Government has continued to press the argument that plaintiff's original application was not timely filed because it did not contain all of the elements described in 28 U.S.C. § 2412(d)(1)(B). For example, defendant charges that the November 14 application was incomplete because it did not "state the actual time expended and the rate at which fees and other expenses are computed;" and that the original motion did not specifically allege that "the position of the United States was not substantially justified." Carrying this analysis to its conclusion, defendant contends that Brunswick's later supplemental brief, which *did* contain the elements specified in § 2412(d)(1)(B), was untimely filed on December 18, 1986, because it was more than 30 days after the Court's settlement Order of October 30, 1986.

■ In its Order of February 3, 1987, the Court found that the December 18 filing was timely under the rule announced in *James v. U.S. Dept. of Housing and Urban Development,* 783 F.2d 997 (11th Cir. 1986). The Court read the *James* case as holding that the EAJA's definition of a final judgment means a judgment which is "no longer 'subject to attack.'" *Id.* at 999. Since an "order of settlement," by definition under the EAJA, is included in the meaning of "final judgment," the Court reasoned that the *James* rule, which tolled the EAJA's 30–day filing period for the filing of fee applications until the expiration of the period in which the Government may file its appeal, ought to apply to an order of settlement as well.

The Government here conceded at oral argument it was not certain whether the settlement Order in the instant case was appealable. The *James* case clearly holds that, where a judgment *is* appealable, it is not final for purposes of the EAJA until "the date on which a party's case has met its final demise, [until] there is nothing further the party can do to give it life." *Id.* at 999. FEMA contested the findings of the arbitration board in this case, alleging certain errors. Although FEMA withdrew its objection before the Court ordered the implementation of the final FIRM on October 30, 1986, Brunswick reasonably could have expected that FEMA might attempt to appeal the settlement Order. That FEMA now contends that it "could not have 'appealed' from this Order without overturning the entire settlement agreement," does not detract from the force of Brunswick's argument. Because FEMA filed no waiver of appeal, the "finality" of the settlement Order was arguably open to question until the expiration of the 60–day period the Government had in which to file its appeal. Consequently, as this Court stated in its Order of February 3, 1987, if the *James* rule is applied to this settlement Order, plaintiff's December 18, 1986, brief was both statutorily complete and timely filed. This result obtains because, under the *James* rule, plaintiff's December 18 brief was filed during the 60–day appeals period and before the 30–day EAJA period had started running.

FEMA draws the Court's attention to a footnote which appeared in the House Report on the EAJA, as support for the view that Congress intended the 30–day period to begin running "on the date when the proceeding is dismissed pursuant to the settlement or when the adjudicative officer approves the settlement." H.Rep. No. 99–120, 99th Cong., 2d Sess. at 18 n. 26 (1985), *reprinted in* 1985 U.S.Code Cong. & Ad. News 132, 146 n. 26. Interestingly, the language cited by the Government is followed by this explanation:

Thus, if the Government does not appeal from an adverse decision, the thirty day period would begin to run upon the expiration of the time for filing notice of appeal....

*Id.* The Report does not indicate whether a settlement Order could be considered an

"adverse decision," as described in the above paragraph. Accordingly, the Court is unpersuaded that the intent of Congress would be thwarted by an application of the *James* rule to the instant case.

However, even assuming for the sake of argument that the Court's Order of February 3, 1987, should be reconsidered, the Court is confident that the same result would be supported by alternative legal authority. In *Dunn v. United States*, 775 F.2d 99, 104 (3d Cir.1985), the court held that a statutorily incomplete EAJA fee application filed within 30 days of a final judgment is timely; and later supplemental filings curing the application's deficiencies relate back to the original filing date. In *Dunn*, the plaintiffs filed an application for fees under the EAJA within the statutory period, but failed to include "a specific amount of fees requested, [or] an itemized statement of the actual time expended and the rate at which fees and expenses are computed." *Dunn, supra* at 101. The court nevertheless reversed a district court's holding that it lacked jurisdiction over the fee petition because plaintiffs failed to include in their application all the statutory elements of 28 U.S.C. § 2412(d)(1)(B).

The Third Circuit Court of Appeals drew a distinction between the "filing requirement" of § 2412(d)(1)(B), which mandates that fee petitions must be filed within 30 days, and the "pleading requirement," which sets out the necessary elements to be included in any EAJA fee petition. In reasoning that the purposes of notice, proof of timeliness and finality, and reliance were adequately served by the timely filing of the application itself, the Third Circuit observed: "It is not immediately apparent that Congress intended that strict compliance with the pleading requirement must be accomplished within the same time as filing." *Id.* at 103. Noting that "Congress was not concerned with the time within which the affected government agencies received information about the details of a fee claim," the court summarized its holdings as follows:

> Thus we conclude that Congress did not intend that defects in the pleading requirements of section 2412(d)(1)(B) be

treated as jurisdictional. So long as a fee petition is filed within the thirty-day period which puts ... the government on notice that the petitioner seeks fees under the [EAJA], the court may consider the petition, and may, absent prejudice to the government or noncompliance with court orders for timely completion of the fee determination, permit supplementation.

*Id.* at 104. *But see* Adams, J., *dissenting*, 775 F.2d 99, 105 (3d Cir.1985).

■ FEMA contends that failure to file within the 30–day time limit deprives the district court of jurisdiction under this Circuit's decision in *Haitian Refugee Center v. Meese*, 791 F.2d 1489, 1494 (11th Cir. 1986). The Court recognizes that compliance with the 30–day limit is indeed characterized as a "jurisdictional" requirement in *Haitian Refugee Center*. However, as explained above, once an applicant has complied with the requirement of filing within 30 days, his failure to provide all of the information described in § 2412(d)(1)(B) may be cured by a supplemental filing.

This approach comports with this Court's Local Rule 11, which expressly allows parties seeking attorney fees to supplement cost estimates contained in fee applications. Plaintiff relied on Local Rule 11.2(c) in its application for fees because that Rule permits a filing party to serve a "detailed specification and itemization of the requested award" within 30 days of filing the original petition. Failing to allow supplementation in this case would be patently unfair on these facts, and the Court declines to do so.

Taken as a whole, all of the above-cited authority compels a finding that this fee application was timely filed under the EAJA.

### (3) Statutory Net Worth

To be eligible for an award of fees under the EAJA, a party must also meet the financial limitations set forth in 28 U.S.C. § 2412(d)(2)(B). That section allows a unit of local government to qualify as an eligible party provided that its "net worth ... did not exceed $7,000,000 at the time the

action was filed." 28 U.S.C. § 2412(d)(2)(B). The issue of Brunswick's net worth at the time this action was filed has been hotly contested by the parties, with each side proferring affidavits of respected and experienced accountants who attest with professional certainty that, under "generally accepted accounting principles" Brunswick's net worth was under $7,000,000 (according to plaintiff's accountants) and over $20,000,000 (according to defendants' accountants) on July 15, 1985.

The difficulty here was aptly framed by counsel for the Government at oral argument when he explained in answer to a question from the Court that a city's "net worth" is simply not defined under "generally accepted accounting principles." This is because the term "net worth" is not normally used with reference to the financial status of a municipality.

The legislative history of § 2412(d)(2)(B) offers little definitional clarification, stating only that "net worth" is calculated by subtracting total liabilities from total assets. H.Rep. No. 96–1418, 96th Cong., 2d Sess. at 15 (1980), *reprinted in* 1980 U.S. Code Cong. & Ad.News 4984, 4994. However, certain language from the House Report on the 1985 amendment to the EAJA lends support to the plaintiff's view that "restricted assets" (those not generally available to meet the payment of debts) ought not to be considered in determining net worth.

Congress' intent in placing financial limits on a party's eligibility to recover fees under the EAJA was to ensure that the benefit of fee awards would go only to those parties whose financial condition might otherwise deter them from asserting their rights. In short, Congress tailored the law to protect those unable to afford to litigate against the Government. Thus, the 1980 House Report states that the purpose of the net worth requirement is to "limit the bill's applications to those persons and small businesses for whom costs may be a deterrent to vindicating their rights." 1980 U.S.Code Cong. & Ad.News 4953, 4994. Likewise, when Congress amended the definition of a party to include local units of government, it noted that "small governmental units face the same inherent problems and deterrence factors as do small private businesses when involved with adversary adjudication or litigation with the United States." 1985 U.S.Code Cong. & Ad.News 132 at 143.

Given the apparent dearth of tangible standards for determining the "net worth" of cities such as Brunswick, and considering the fact that the accounting methodology adopted by plaintiff's accountants seems to be more consistent with the Congressional focus on ability to pay, the Court accepts the plaintiff's version of Brunswick's net worth. Adopting the approach of defendant's accountant would seem to undercut the Congressional policy of removing the financial deterrent to litigation against the national government. A city that could not afford to litigate as a practical matter might still be disqualified because the Government's accounting methods would include, in calculating the city's net worth, assets which are not generally available to meet the city's obligations.

■ Since plaintiff's accountants use methods focusing more closely on actual *ability to pay*, which seems to be consistent with the Congress' concerns over the deterrent effect of high-cost litigation, the Court accepts their valuation of Brunswick's net worth as of July 15, 1985. Accordingly, Brunswick's net worth meets the requirements of the EAJA.

**(B) Substantial Justification**

The EAJA directs the Court to award attorney fees to a prevailing party in an action against the Government "unless the Court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). The "position of the United States" is defined in the Act as "in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based." 28 U.S.C. § 2412(d)(2)(D). Thus, in attempting to make a finding as to whether the Government was substantially justified, the Court may consider both the substantive agency

action taken by FEMA and the legal positions advanced by the United States. The Government bears the burden of proof in showing that its position was substantially justified or, in other words, "that its case had a reasonable basis both in law and fact." *Haitian Refugee Center, supra* at 1497. Because Congress rejected the term "reasonably justified" and chose "substantially justified" instead, the test is actually more than mere reasonableness. *Id., see also Spencer v. NLRB*, 712 F.2d 539, 557–58 (D.C.Cir.1983).

### (1) FEMA's Original Agency Action

FEMA seeks to restrict the scope of the substantial justification inquiry by contending that the Court may not take into account the substantive accuracy of FEMA's FIS in determining whether the agency action here was substantially justified. This contention rests on the theory that, because the Court in its Order of January 9, 1986, dismissed Brunswick's count seeking judicial review of the FIS and FIRM, the Court may not now review them to determine whether they were substantially justified. Although defendant's argument has the allure of technical precision, it ignores the practical reality of the case. Defendant did succeed on summary judgment on plaintiff's count seeking judicial review of the FIS and the FIRM, but plaintiff's other counts—charging serious mismanagement and procedural improprieties—remained in the case and would have been resolved at trial.

■ Rather than undergo a trial on the merits of the remaining issues, FEMA knowingly waived its right not to have the FIS and FIRM examined and, instead, submitted the issue of their accuracy to arbitration carried out under supervision of the Court. Since FEMA elected to enter into a settlement agreement which placed the FIS and the FIRM squarely before the Court's arbitration panel, it cannot now be heard to complain that the substantial justification of this agency action is outside the permissible scope of the Court's review.

This viewpoint finds support in the relevant legislative history addressing the Court's proper field of inquiry in a determination of substantial justification. The

1985 House Report on the Amendments to the EAJA provides the following guidance:

> When the case is conceded on the merits, dropped by the agency, or otherwise settled on terms favorable to the private party before any of the merits are heard, the court (or adjudicative officer) will again look to the record in the case to determine whether the position of the government was substantially justified. The record in this instance will consist of the pleadings, affidavits and other supporting documents filed by the parties in both the fee [proceeding] and the case on the merits.

H.Rep. No. 99–120, Part I, 15, 1985 U.S. Code Cong. & Ad.News, pp. 141–42.

The findings of the arbitration panel, along with the evidence considered by that panel, constitute a significant portion of the rather ponderous record compiled in this case. In its attempt to determine whether the United States was substantially justified, the Court shall not ignore all the material developed in the course of this proceeding, particularly the findings of the arbitrators. The Court, accordingly, rejects the Government's jurisdictional argument and concludes that it may consider the entire record before it in determining the question of substantial justification.

As a preliminary matter, however, the Court also rejects defendant's contention that the "agency action" to be reviewed is FEMA's denial of plaintiff's request for an extension of the effective date of the FIS. Defendant claims that this denial would have been reviewed on the basis of the administrative record only under an arbitrary-and-capricious standard. *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Without questioning defendant's statement of the law, it must be remembered that the facts of this case raise more than the propriety of FEMA's denial of a request for an extension. The lawsuit challenges the accuracy of the FIS and the FIRM. Thus, it is *that* agency action which must be reviewed in light of the whole record under the EAJA's standard of substantial justification. 28 U.S.C. §§ 2412(d)(1)(A) & (B), (d)(2)(D).

■ Turning now to the issue of whether FEMA's original agency action—the performance of the FIS and FIRM—was substantially justified, the Court makes reference to the findings of the arbitrators. In this regard, it is appropriate to recall that the Court held a conference with the arbitrators on March 21, 1986, in order to define the scope of their duties. In response to the Court's description of those duties, one of the arbitrators remarked: "I guess if we find some element of the study that was done originally was totally in error, and there may be a problem evaluating what that error was in the final number, that's the only thing I can see." Transcript of Conference with the Court, March 21, 1986, at p. 10. That statement by arbitrator Richard Tomasello indicates that he saw the panel's role as an attempt to identify significant errors, if any, in the performance of the FIS, and to recalculate the BFE's to reflect the correction of those errors.

It is not disputed that Brunswick contested the base flood elevations contained in the original FIS and FIRM; nor is there any question that FEMA's methodology contained errors requiring a new BFE to be adopted. While Brunswick contends that major errors were committed, the Government defends its study by pointing out that the arbitrators' final BFE's diverged only a couple of feet from those reached by the official FIS. The degree of difference between the final figures of the panel and those of the Government are more relevant to the question of whether Brunswick prevailed than to the question of substantial justification.

A careful reading of the arbitrators' report and other relevant documents in the record leaves little doubt that the FIS contained a variety of unreasonable errors. FEMA contends that these errors represent mere differences of opinion among experts. This contention is belied by the fact that the arbitrators noted in their report those instances where FEMA's approach was reasonable under professional standards. In such cases, the panel did not attempt to reassess the data or criticize FEMA's conduct. The findings of the arbitrators demonstrate that FEMA's original agency action fell below the reasonable standard of performance of experts in the field of environmental planning. Such a conclusion requires the Court to find that FEMA's original agency action in performing the FIS in this case was not "reasonable in law or fact" and, therefore, not substantially justified. *Haitian Refugee Center, supra* at 1497. Citizens and units of local government subject to federal regulations have a legitimate expectation that those federal actions will meet the professional standards of the field in which they regulate. FEMA's failure to meet those standards resulted in this litigation.

In accordance with the preceding rationale, the Court finds that the position of the United States, as expressed in the "action or failure to act by the agency upon which the civil action is based," was not substantially justified. 28 U.S.C. §§ 2412(d)(2)(D), (d)(1)(A).

**(2) Legal Position of the United States**

■ Having found that FEMA's original agency action was not substantially justified, the Court need not continue to inquire into the substantial justification of the Government's legal position. That prior finding alone may support an award of fees incurred during the entire case on the merits. *Russell v. National Mediation Board*, 775 F.2d 1284, 1291–92 (5th Cir.1985). However, given the intensity of the dispute between the parties over FEMA's defense against certain procedural claims brought by Brunswick, the Court considers that the record should be clarified by a finding as to whether the Government's litigation position was substantially justified. The Court finds that it was.

Briefly, Brunswick raised three rather creative challenges to the FIS in addition to the attack on its accuracy. The three claims were: (1) that the methodology used by FEMA in conducting the FIS should be construed as a "rule" under the Administrative Procedure Act and, therefore, subject to notice and comment rule-making procedures, 5 U.S.C. §§ 553(b)(3), (c); (2) that the FIRM should not have been implemented without first conducting a site-spe-

cific environmental impact statement as required in certain circumstances by the National Environmental Policy Act of 1969, 42 U.S.C. § 4332 *et seq;* and (3) that FEMA made an unlawful delegation of authority to a private contractor without adequately supervising that contractor's performance of the FIS.

As is amply demonstrated by the scores of pages of legal argument dedicated to these claims in the briefs of the parties, the law presents no immediately clear answer to the questions raised by these procedural contentions. Since the suit settled, the Court has never spoken to the merits presented by these questions. Given the lack of clarity of the governing law, the Court believes that the legal position of the Government on these claims, as well as its threshold arguments discussed earlier, were substantially justified. *Haitian Refugee Center, supra* at 1497.

### II. Award of Attorney Fees, Costs and Other Expenses

Although Brunswick advances grounds for an award of fees under Fed.R.Civ.P. 11 and under common law theories of bad faith, the Court need not discuss these grounds because the above findings are sufficient to justify an award under the EAJA. Moreover, the record does not support a finding that the Government's conduct amounted to bad faith. Consequently, the only remaining issue is the proper amount of such an award under the EAJA. The United States enumerates several reasons for reducing any award to Brunswick; those reasons having colorable merit shall be considered individually.

### (A) Effect of the Settlement Stipulation

On January 29, 1986, the parties signed a settlement agreement which became an Order of the Court. Paragraph 11 of the stipulation of settlement provides as follows:

All costs of any nature incurred in implementation of this agreement, including all work performed at the direction of the panel, or as a result of the panel's decision, shall be borne equally between the City of Brunswick and the Federal Emergency Management Agency. The proportionate share of the cost of the work performed will be billed directly to each party.

Pursuant to this paragraph, defendant contends that plaintiff is not entitled to recover any costs arising from the arbitration hearing. The Government further contends, even more expansively, that no fees, expenses or costs incurred after January 29, 1986, are recoverable because that date marked the end of this litigation by way of settlement.

In response, plaintiff cites paragraph 15 of the same settlement Order, which provides that "plaintiff will make application for an award of attorney fees and costs within thirty days of the conclusion of the process outlined above." Plaintiff interprets the cost-sharing provision of the stipulation as providing that expenses will be borne equally by the parties *during* the arbitration process, but that, if Brunswick prevailed, it would then be entitled to seek reimbursement of those expenses.

The plain language of the stipulation imposes an obligation on Brunswick to pay half of the costs incident to the arbitration process. While these costs clearly are not meant to include attorney fees, they must be understood to encompass the fees of the arbitrators, the fees of witnesses and consultants requested by the arbitrators, reporting and duplication costs and other such expenses made necessary by the panel's proceedings. The agreement to share these costs is a "special circumstance" within the meaning of that term in 28 U.S.C. § 2412(d)(1)(A) which would make an award of these costs unjust. Accordingly, none of the costs charged to plaintiffs as a result of the arbitration process may be recovered under the EAJA.

With regard to the Government's argument that the EAJA does not permit the recovery of any fees or costs incurred subsequent to the January 29, 1986, settlement stipulation, the Court turns to cases addressing a similar situation arising under the Civil Rights Attorney Fee Awards Act, 42 U.S.C. § 1988. Fees incurred as a result of work performed after the date of a

settlement agreement are recoverable under § 1988 provided the work was "closely related to the primary issue and objective of the case." *Williams v. City of Fairburn, Ga.*, 702 F.2d 973, 976 (11th Cir. 1983). In this case, plaintiff's counsel was duty-bound to pursue Brunswick's case throughout the arbitration process. Accordingly, the Court finds that fees and expenses arising out of the settlement activities preceding the Court's Order of October 30, 1986, are generally recoverable under the EAJA.

### (B) Permissible "Other Expenses"

Defendant urges the reduction of any award to plaintiff through a restrictive interpretation of the term "other expenses" found in § 2412(d)(1)(A). The contention of the Government rests on a construction of the EAJA in light of other "costs" statutes.

First, FEMA contends that any expert witness fees sought by plaintiff should be limited to the statutory amount specified in 28 U.S.C. § 1821. Witness fees taxed under that statute have been strictly limited to the statutory amounts. *Kivi v. Nationwide Mutual Ins. Co.*, 695 F.2d 1285, 1289 (11th Cir.1983). FEMA further argues that the only experts entitled to such specifically defined fees are those who *testified* as witnesses.

Second, FEMA argues that the only recoverable costs are those listed in 28 U.S.C. § 1920. That statute permits the Court to tax such costs as the fees of the clerk, court reporting and transcript fees, fees for printing and witnesses, fees for copying, docket fees and fees of court-appointed experts, provided that these expenses are necessarily incurred for use in the case. 28 U.S.C. § 1920(1)–(6). The EAJA allows a plaintiff to recover "costs, as enumerated in Section 1920 of this title...." 28 U.S.C. § 2412(a). In this case, the Court finds that the costs plaintiff seeks for depositions, copying and court hearing transcripts were necessarily incurred for use in the case.

Third, FEMA limits the meaning of "other expenses" under the EAJA exclusively to those examples listed in § 2412(d)(2)(A). In that section, Congress defined "fees and other expenses" to "include":

the reasonable expenses of expert witnesses, the reasonable costs of any study, analysis engineering report, test or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees....

On the authority of this language, defendant urges the Court to deny any other expenses sought by plaintiff, such as taxi fares, messenger services, travel expenses, telephone bills and postage.

Brunswick responds first that "expert fees" are recoverable under § 2412(d)(2)(A) without reference to the statutory amounts provided in 28 U.S.C. § 1821; second, that "other expenses" under the EAJA permits the award of costs in addition to those specified in 28 U.S.C. § 1920; and, finally, that the definition of "other expenses" set out in § 2412(d)(2)(A) was not meant to be exclusive.

The structure of the EAJA indicates that recoverable "fees and expenses" are *"in addition* to any costs awarded pursuant to" § 1920. 28 U.S.C. § 2412(d)(1)(A). At the same time, those fees and expenses may be awarded only subject to the exceptions "otherwise provided by statute...." *Id.* Since the EAJA refers to prevailing market rates as a method for determining proper amounts of fees, the Court is dubious of the contention that the amounts awardable were meant to be governed by § 1821. 28 U.S.C. § 2412(d)(2)(A). To the extent that such fees include the reasonable expenses of expert witnesses, it is evident that Congress did not intend the restrictive amounts of § 1821 to apply. As for the claim that only expert fees of *witnesses* are permitted under the EAJA, the Court finds that the answer turns on whether the list of examples provided in § 2412(d)(2)(A) is exclusive or simply illustrative.

Turning again to the structure of the definitions contained in the EAJA, it appears that where the drafters used the word "includes" they intended to provide a *non-exhaustive* list of examples to clarify the meaning of the term. For example, § 2412(d)(2)(G) provides that " 'court' in-

*cludes* the United States Claims Court," (yet that section may not be interpreted to mean that *this Court* would not meet the statutory definition); likewise, in § 2412(d)(2)(C), " 'United States' *includes* any agency and any official of the United States acting in his or her official capacity." Where Congress intended a more exclusive definition, it used the word "means," as in § 2412(d)(2)(B), where "party" *means* an individual with the appropriate net worth. Several circuits have construed "fees and other expenses" to encompass "costs that are ordinarily billed to a client." *International Woodworkers of America v. Donovan*, 769 F.2d 1388, 1392 (9th Cir.1985); *Aston v. Secretary of Health and Human Services*, 808 F.2d 9, 12 (2d Cir.1986). The Court agrees with the conclusion of these cases that the list of expenses provided in § 2412(d)(2)(A) was not meant to be all-inclusive. Such a reading resonates with the purposes of the EAJA in allowing prevailing parties in actions against the Government to be *fully* compensated for the costs of asserting their rights in cases where the Government's position is not substantially justified.

### (C) Permissible Attorney Fees

Defendant launches a three-pronged attack on the amount of fees charged by plaintiff's counsel: (1) that Mr. Walbert's rate of $125 per hour is in excess of the $75 per hour recommended by the statute, and that any other rate should be measured by the prevailing market rate in this District; (2) that counsel has billed an excessive number of hours for the amount of work represented by this case; and (3) that counsel's rate of pay should be discounted according to the nature of the work performed.

■ Regarding the proper rate for Walbert, the Court refers to § 2412(d)(2)(A) of the EAJA, which provides:

(ii) attorney fees shall not be awarded in excess of $75.00 per hour unless the Court determines that an increase in the cost of living or a special factor such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.

Under its authority pursuant to the above-quoted statute, the Court hereby determines, on the basis of its own close familiarity with the qualifications of the local bar, that a $125 hourly rate for an attorney of Walbert's special training and experience is justified by the limited availability of equally qualified attorneys capable of adequately handling this kind of case. To this highly complicated, scientifically oriented case Walbert brought the skills of graduate training in physics and significant experience in complex federal litigation. For this same reason, the Court finds that the Atlanta area is the appropriate region for determining the prevailing market rate, because that is the nearest market for attorneys with the requisite qualifications in this type of litigation.

■ Defendant also argues that attorney Highsmith's rate of $75 per hour, being higher than what he normally charges the City for his services, is unjustified. A determination of whether such a rate is reasonable may be made with reference to certain factors identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). Taking into account those of the *Johnson* factors which are relevant, the Court finds that the $75 hourly fee for Highsmith is justified. Specifically, considering the novelty and difficulty of the questions in this case, the high degree of technical skill necessary to perform the service properly, the customary fee in Brunswick (which, for highly qualified attorneys, *is* $75 per hour), the amount of time and money involved in the case and the favorable results obtained, along with the experience, reputation and abilities of the attorneys, there is sufficient ground to support an award of fees at $75 per hour for Highsmith and $125 per hour for Walbert. *See also N.A.A.C.P. v. City of Evergreen, Ala.*, 812 F.2d 1332, 1336 (11th Cir. 1987); *Florida Sun Coast Villas, Inc. v. United States*, 776 F.2d 974 (11th Cir.1985).

■ Focusing next on the question of whether plaintiff's counsel seeks an excessive number of billable hours, the Court is likewise unpersuaded by the showing of defendant. Simply because attorneys in

other situations have billed less time for longer cases does not show that plaintiff's counsel in *this* case has padded his bill. The Court is acutely cognizant of the fact that the highly technical nature of this case has required an enormous investment of time. Because defendant has been unable to specify instances of exaggerated hourly estimates, and the Court independently can detect no examples of excess, the number of hours billed by Walbert must stand as accurate.

■ Defendant's third argument is that plaintiff's attorney fees should be recalculated at different rates according to the nature of the task performed. Defendant fails to show which of the tasks performed by Walbert could be considered non-legal work, and plaintiff alleges that no clerical or paralegal work was included in his firm's billings. Defendant does point to a variety of tasks performed by Highsmith which allegedly do not constitute "substantive legal work" and, therefore, should command a lesser rate. *Johnson, supra* at 717. The Court concurs with the *Johnson* rule on this question, and Highsmith's award will be reduced according to the rationale discussed below.

### (D) Availability of Fees for Fee Litigation

This Circuit has not conclusively decided the question of whether those fees incurred in the course of litigation over fees should be awarded under the EAJA. Although a panel of the Eleventh Circuit had adopted a *per se* rule allowing the recovery of "fees on fees" in *Haitian Refugee Center v. Meese,* 791 F.2d 1489, 1500 (11th Cir.1986), that portion of the opinion establishing the *per se* rule was later vacated on petition for rehearing. *Haitian Refugee Center v. Meese,* 804 F.2d 1573 (11th Cir.1986). Those circuits which have treated this question have almost uniformly adopted the rule that a party is not entitled to an award of fees *on fees* unless the Government's position in litigating the fee issues was not substantially justified. *American Academy of Pediatrics v. Bowen,* 795 F.2d 211 (D.C.Cir.1986); *Russell v. National Mediation Board,* 775 F.2d 1284, 1291 n. 8 (5th Cir.1985); *Cornella v. Schweiker,* 741

F.2d 170 (8th Cir.1984); *Rawlings v. Heckler,* 725 F.2d 1192 (9th Cir.1984).

■ Relying then on the persuasive authority of these decisions, the Court holds that plaintiff is not entitled to an award of fees incurred as a result of this fee litigation because the Court cannot conclude that the Government's legal positions in opposition to the fee petition were not substantially justified. Given that the purpose of the EAJA is to permit an award of fees only where the Government's position is not substantially justified, an award of fees on fees would not be appropriate in this case.

### (E) Miscellaneous Grounds for Reduction of the Award

The preceding discussion has focused on those contentions considered by the Court to be the most significant and dispositive of the parties' claims. Contentions not specifically treated were weighed and considered unworthy of discussion. Consequently, while the result of this case may be supported adequately by the preceding rationale, the Court believes it would be appropriate to address several other miscellaneous grounds put forward by defendant to justify a reduction in the award.

### (1) Plaintiff's "Limited Success"

As discussed previously and at length, the Court is of the opinion that plaintiff prevailed on its central claim, which was that the original FIS was unreasonably inaccurate. However, in *Hensley v. Eckerhart,* 461 U.S. 424, 439, 103 S.Ct. 1933, 1942, 76 L.Ed.2d 40 (1983), the Supreme Court held that "where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained."

■ Although plaintiff did not succeed on the merits of any of the counts enumerated in its complaint (because plaintiff lost one claim at summary judgment and the other claims were settled), the Court is unable to conclude that the time spent on any *single* claim was unproductive toward or unrelated to the ultimate favorable dis-

position of the suit. Although plaintiff's procedural claims would have required a different factual inquiry from that necessary for a hearing on the adequacy of the FIS, those claims arose out of the same set of facts giving rise to the dispute, and leading eventually toward its settlement. The Court is not capable of discerning which of these undecided claims were in fact "successful" in determining the final result in plaintiff's favor. Indeed, viewing the litigation and settlement process as a whole, the Court is convinced that plaintiff's claims were an inter-related attempt to force the revision of the FIRM. Since that goal *was* achieved, no reduction in the award on the grounds that some of the claims were "unsuccessful" is in order.

#### (2) Plaintiff Unreasonably Protracted Litigation

The record is replete with examples of aggressive tactics and strategies seemingly interposed for the purposes of delay on the part of *both* of these parties. Each party could be accused of seeking to delay these proceedings when such a delay was perceived to be in its interest. Under these circumstances, the Court is unwilling to tax *only* plaintiff for following this course of possibly overzealous advocacy.

#### (3) Adequacy of Highsmith's Records

The original time records submitted by Highsmith failed to allocate with precision the amount of time spent on each of the tasks enumerated. In a supplemental filing, Highsmith provides a more detailed daily summary of his time. Although defendant contends that "casual after-the-fact estimates of time expended on a case are insufficient to support an award of attorney fees," *National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1327 (D.C.Cir.1982), the Court considers Highsmith's supplement a credible and accurate reconstruction of the amount of time consumed by his services. Moreover, while plaintiff bears the burden of "establishing entitlement to an award and documenting appropriate hours and appropriate hourly rates," *Hensley v. Eckerhart, supra* at 437, 103 S.Ct. at 1941, there is no requirement in this Circuit that "contemporaneous time records" constitute the only acceptable method of documentation.

Nevertheless, as noted in the Court's discussion on permissible attorney fees, defendant correctly observes that Highsmith's records contain charges for "non-legal" services at a single uniform rate. The Court has carefully examined Highsmith's records and finds references to a variety of non-legal work which could have been performed by non-professional staff and, therefore, should not be assessed at attorney fee rates. The format of Highsmith's records does not precisely state the number of hours attributed to each individual task. The Court, therefore, must necessarily make a reasonable estimate of the hours spent on the non-legal work described in Highsmith's records. Those records are sufficiently descriptive to determine which entries would be considered "non-legal," and the Court refers to those entries characterized as trips to City Hall, trips to various printing shops, arranging of travel plans and preparing Federal Express shipments as examples of "non-legal" work. Approximately 26 of Highsmith's hours shall accordingly be recalculated at a lower rate of $25 per hour, resulting in a reduction of his award by $1,300. In addition, it is apparent that Highsmith seeks compensation for 25.5 hours of work spent on preparation of Brunswick's fee application. Since "fees on fees" are not recoverable, another $1,912.50 must be deducted from Highsmith's award.

### CONCLUSION

Having found that plaintiff prevailed in this litigation, and that the original agency action of defendant was not substantially justified, the Court hereby AWARDS to plaintiff the following attorney fees, costs and other expenses, pursuant to 28 U.S.C. §§ 2412 and 1920:

I. Attorney Fees, Costs and Other Expenses Under the EAJA

A. Attorney Fees:
- Walbert & Hermann ....... $ 95,751.25
- Eugene Highsmith ......... 116,600.00

B. Assistance of Experts ....... 80,032.67

C. Travel:
- For depositions ........... 6,790.01
- Other necessary for the case 5,252.46

D. Federal Express and Courier 2,130.95

E. Long Distance Calls ......... 2,535.00

F. Exhibits ..................... 3,783.76

SUBTOTAL ................ $312,876.10

II. Costs Under § 1920
A. Depositions .................. $ 7,740.30
B. Copies ...................... 3,875.75
C. Transcripts ................. 117.75
SUBTOTAL ............... $ 11,616.05
GRAND TOTAL .......... $324,492.15

Accordingly, the Court finds that plaintiff's petition for an award of attorney fees, costs and other expenses is hereby GRANTED in the amount of $324,492.15 and the Clerk is directed to enter an appropriate judgment in that amount.