Marie Lucie **JEAN**, et al.,
**Plaintiffs–Appellees,**

v.

Alan C. **NELSON**, et al.,
**Defendants–Appellants.**

No. 86–5887.

United States Court of Appeals,
Eleventh Circuit.

Dec. 27, 1988.

---

Michael J. Singer, Mary T. Koehmstedt, U.S. Dept. of Justice, Office of Immigration Litigation, Washington, D.C., for defendants-appellants.

Niels W. Frenzen, Ira J. Kurzban, Miami, Fla., Terrence A. Corrigan, Robert E. Juceam, Sandra Lipsman, New York City, Irwin P. Stetzky, Bruce J. Winick, University of Miami School of Law, Coral Gables, Fla., for plaintiffs-appellees.

Before KRAVITCH and CLARK, Circuit Judges, and ESCHBACH *, Senior Circuit Judge.

CLARK, Circuit Judge:

In another chapter of what has been a long, complex, and bitterly contested lawsuit, the United States has challenged an award of attorney's fees and costs pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412. Supplied with the Supreme Court's first EAJA decision, *Pierce v. Underwood,* —— U.S. ——, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), we have concluded that the district court did not abuse its discretion in finding that the plaintiffs are entitled to an award of attorney's fees, expenses and costs. But because the district court's calculation of the award is inconsistent with certain standards set forth in *Pierce* and other case law, we are vacating its award and remanding the case for a recalculation of the award.

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

## I. BACKGROUND

### A. *Litigation on the Merits*

The facts concerning this case are well known. *See Louis v. Nelson*, 544 F.Supp. 973 (S.D.Fla.1982) (*Jean I*); *Jean v. Nelson*, 711 F.2d 1455 (11th Cir.1983) (*Jean II*), *vacated by reh'g in banc*, 727 F.2d 957 (11th Cir.1984) (*Jean III*), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (*Jean IV*). For the purposes of the assessing the plaintiffs' right to attorney's fees and costs under the EAJA, we will detail only the nature and substance of their claims, and the results—both judicial and extrajudicial—that they obtained.

The lawsuit began as a challenge to the practice, instituted by the Immigration and Naturalization Service (INS), of holding mass exclusion hearings for the plaintiff class composed of Haitian refugees. It evolved quickly into a broad-based challenge to INS's policy of detaining the class members, during the pendency of their applications for asylum, without any possibility of parole. The complaint filed on June 16, 1981 contained seven counts, four of which were dismissed by the district court on February 24, 1982.[1] Three issues remained for trial: (1) whether the defendants' departure from the established policy of paroling undocumented aliens, without formal rulemaking, violated the Administrative Procedure Act (APA), 5 U.S.C. § 553; (2) whether the unique manner in which Haitian refugees were treated violated their right to equal protection under the Fifth Amendment, since it amounted to a classification based on race and national origin; and (3) whether the class members were unlawfully denied their First Amendment rights of access to legal counsel, relatives, and friends in the Miami community.

After a six-week trial, the district court ruled that INS had violated the APA by failing to engage in formal rulemaking before revising its policy of paroling applicants for asylum. *Jean I*, 544 F.Supp. at 993–97, 1003–04. Ten days later, the court declared by separate order that the detention policy was void, and ordered the release of the plaintiff class pursuant to a plan detailed in the order. *Louis v. Nelson*, 544 F.Supp. 1004, 1006–09 (S.D.Fla. 1982). The court also ruled that there was insufficient evidence to support the plaintiffs' equal protection claim. *Jean I*, 544 F.Supp. at 997–1002, 1004. The court declined to rule on the access claim, "ostensibly because the issue was mooted by the release order." *Jean II*, 711 F.2d at 1464.

A panel of this court affirmed the district court's APA ruling, concluding that the policy of detaining undocumented Haitian refugees constituted a new "rule" that had been formulated without following APA rulemaking procedures. *Id.* at 1474–83. The panel reversed the district court's holding that the plaintiffs had failed to make out a case of intentional discrimination. *Id.* at 1483–1502. The panel also reached the merits of the claim, dismissed by the district court, that the class members had been denied a right to receive notification that they were entitled to apply for asylum. *Id.* at 1507–08. Finally, the panel acknowledged that the plaintiffs' access claim was not moot because of the possibility that INS would revoke class members' parole; it ordered a remand to determine whether the government's access restrictions were unlawful. *Id.* at 1508–09.

Sitting in banc,[2] this court held that the APA claim as originally presented to the

---

1. In the counts dismissed by the district court, the plaintiffs claimed that (1) the defendants (INS officials and the attorney general) had compelled the plaintiffs to appear at preliminary interviews in which the plaintiffs were not advised of their right to counsel nor permitted to be accompanied by counsel, all in violation of the Administrative Procedure Act, 5 U.S.C. § 555(b); (2) the failure of the defendants to notify class members of procedural rights attendant to their exclusions hearings violated INS's own regulations, the Immigration and Nationality Act (INA), 8 U.S.C. § 1362, and the Fifth Amendment's Due Process Clause; (3) pursuant to INS regulations, the class members were entitled to individualized, public exclusion hearing; and (4) the defendants were denying the plaintiffs the right to apply for political asylum, in violation of the Due Process Clause, INA § 1158, and INS regulations.

2. Pursuant to our rules, the granting of rehearing in banc vacated the panel opinion. 11th Cir.R. 35–11. The in banc court, however, adopted the panel and district court statements of the facts. *See Jean III*, 727 F.2d at 962.

district court had become moot because the class members were no longer subject to detention, unless such detention was pursuant to new regulations promulgated by INS subsequent to the district court's decision in *Jean I.* These regulations, *see* 8 C.F.R. § 212.5, require INS to make parole determinations without regard to an alien's race or natural origin; thus, we dismissed the appeal as to the APA claim. *Jean III,* 727 F.2d at 962.[3] As for the equal protection claim, the court held that excludable aliens have no equal protection rights with regard to the processing of their asylum or admission applications or INS determinations that they should not be paroled. The claim was nonetheless remanded to determine whether low-level INS officials were discriminating against plaintiffs in violation of instructions from their superiors. *Id.* at 967–79. The court also held that the Refugee Act of 1980 does not create a constitutionally protectable interest in receiving notice of the right to petition for asylum. *Id.* at 979–80. Finally, the court held that the access claim was not moot and remanded it to the district court for full consideration.

In *Jean IV,* the Supreme Court affirmed the judgment of our in banc court, but explained that we should not have reached the merits of the constitutional question. In arguing the case before the Court, the Solicitor General conceded that because the statute granting parole authority to the attorney general, 8 U.S.C. § 1182(d)(5)(A), and 8 C.F.R. § 212.5, did not include race or natural origin as factors relevant to a parole determination, INS was prohibited from considering these factors.[4] In light of the neutral quality of the criteria contained in the new regulation, the Court affirmed our in banc court's judgment "insofar as it remanded to the District Court for a determination whether the INS officials are observing this limit upon their broad statutory discretion to deny parole to class members in detention." *Jean IV,* 105 S.Ct. at 2998. The question to be resolved on remand was whether INS was properly following the statutory and regulatory framework in making parole determinations. *Id.*

### B. Attorney's Fee Litigation

The Supreme Court has admonished the courts to ensure that a request for attorney's fees does "not result in a second major litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Contests over EAJA fees and expenses do not typically threaten to upset this ideal.[5] Yet a case of this magnitude and complexity, in which approximately 45 lawyers have periodically participated,[6] can be expected to place sub-

---

**3.** Because the government is no longer detaining any class members except pursuant to the new regulations, the APA issue as originally presented has been rendered moot. The validity of these new regulations is not before this court, and we express no opinion in this regard. We accordingly dismiss the appeal as to [the APA claim] and remand with instructions that this part of the district court's judgment be vacated.
*Jean III,* 727 F.2d at 962.

**4.** Respondents [the government defendants] concede that the INS' parole discretion under the statute and these regulations, while exceedingly broad, does not extend to considerations of race or national origin. Respondent's position can best be seen in this colloquy from oral argument:
"Question: You are arguing that constitutionally you would not be inhibited from discriminating against these people on whatever ground seems appropriate. But as I understand your regulations, you are also maintaining that the regulations do not constitute any kind of discrimination against these people, and ... your agents in the field are inhibited by your own regulations from doing what you say the Constitution would permit you to do." "Solicitor General: That's correct."
*Jean IV,* 105 S.Ct. at 2997 (quoting transcript of oral argument before the Supreme Court).

**5.** The overwhelming majority of EAJA awards in fiscal year 1986–87 were against the Department of Health and Human Services (351 of 387 awards). The average award was $2,379. *Pierce v. Underwood,* —— U.S. ——, 108 S.Ct. 2541, 2549, 101 L.Ed.2d 490 (1988) (citing Annual Report of the Director of the Administrative Office of the U.S. Courts, Fees and Expenses Awarded Under the Equal Access to Justice Act pp. 99–100, Table 29 (1987)).

**6.** "The government had, at one time or another, thirty different attorneys working on the case. Naturally, the Plaintiffs had to respond in kind with their own forces, although, the Court notes

stantial pressure on the norm. After a hearing consuming five days, and a review by the district court of "hundreds of pages of affidavits," the court awarded $950,-944.87 in attorney's fees to seven individual attorneys and one law firm, $152,169.33 in costs and expenses to two individual attorneys, one law firm and the Haitian Refugee Center. It also awarded fees, expenses and costs for the attorney's fee litigation itself.

The district court's rulings and award are contained in two deliberate and detailed orders, the first assessing the plaintiff's entitlement to fees, the second explaining the court's calculations.[7] Because the government has contested virtually every aspect of the district court's legal rulings and calculations, and because there is merit to some of the government's contentions, we will closely analyze the components of these orders.

## II. QUALIFYING FOR EAJA FEES

■ The EAJA provides that

a court shall award to a prevailing party ... fees and other expenses, ... incurred by that party in any civil action, ... brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). As the district court noted, there are three predicate findings to an award of EAJA fees and expenses: (1) the litigant opposing the United States must be a "prevailing party"; (2) the government's position must not have been substantially justified; and (3) there

must be no circumstances that make an award against the government unjust. 646 F.Supp. at 1324. Only the first two of these issues concern us because the United States does not maintain that there are special circumstances that make the EAJA award unjust.

### A. Are the Plaintiffs Prevailing Parties?

Our circuit employs the same test to determine whether an applicant for EAJA fees is a "prevailing party" as we use to resolve "prevailing party" eligibility for attorney's fees under 42 U.S.C. § 1988:

The prevailing party test is "whether he or she has received substantially the relief requested *or* has been successful on the central issue," *Watkins v. Mobile Housing Board*, 632 F.2d 565, 567 (5th Cir. Unit B 1980), *or*, stated another way, whether "plaintiffs' lawsuit was a catalyst motivating defendants to provide the primary relief sought in a manner desired by litigation." *Robinson v. Kimbrough*, 652 F.2d 458, 465 (5th Cir.1981).

*Martin v. Heckler*, 773 F.2d 1145, 1149 (11th Cir.1985) (in banc) (emphasis added).[8]

The United States contends that the plaintiffs did not prevail under this standard. The government's position appears to be that the "real" issue in this case was the equal protection claim, on which the plaintiffs failed to secure relief. The government considers the APA claim, on which the plaintiffs unquestionably prevailed before the district court, to be insufficient to support an attorney's fee award since we later held it was moot, and ordered that the resulting injunctive relief be vacated. There are two responses to the government's position.[9]

that Plaintiffs had approximately one half the number of counsel." *Louis v. Nelson*, 646 F.Supp. 1300, 1308–09 (S.D.Fla.1986).

7. The court's order entitled "Corrected Memorandum Opinion and Order on Attorney's Fees, Costs, and Expenses" appears at 646 F.Supp. 1300 (S.D.Fla.1986). This opinion details the manner in which the award was calculated. An earlier order discussing the plaintiffs' entitlement to fees and costs appears as an appendix to this memorandum opinion. *See id.* at 1323–38.

8. For an indication in the EAJA's legislative history that Congress intended to give the term prevailing party the same meaning it has in other fee-shifting statutes, see H.R.Rep. 1418, 96th Cong., 2d Sess. 11, *reprinted in* 1980 U.S. Code Cong. & Admin.News 4984, 4990.

9. At oral argument, counsel for the United States conceded that the plaintiffs were prevailing parties with regard to the APA claim. We elaborate on the meaning of the term "prevailing party" to explain why prevailing on this

■ First, it is well established that a party need not obtain relief on every claim or legal theory it propounds in order to be considered "prevailing" under a fee-shifting statute. In the context of the Civil Rights Attorney's Fees Act, 42 U.S.C. § 1988) (section 1988), the Supreme Court has made clear that a plaintiff is "prevailing" if he proves "his entitlement to *some* relief on the *merits* of his claims, either in the trial court or on appeal." *Hanrahan v. Hampton*, 446 U.S. 754, 757, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980) (per curiam) (emphasis added). He or she need not prevail on all legal issues. *Id.* Our court has applied these standards in the EAJA context. *See Haitian Refugee Center v. Meese*, 791 F.2d 1489, 1495–96 (11th Cir.) (interim EAJA award where plaintiffs prevailed on a central issue), *vacated in part on other grounds*, 804 F.2d 1573 (11th Cir.1986); *Ray v. Florida Cabinet*, 845 F.2d 311, 313 (11th Cir.1988).

Second, our in banc court has held that the mooting of a lawsuit by a defendant's favorable remedial action does not necessarily deprive a plaintiff of "prevailing party" status. *Martin*, 773 F.2d at 1149 (citing *Fields v. City of Tarpon Springs*, 721 F.2d 318, 321 (11th Cir.1983) (per curiam)); *Doe v. Busbee*, 684 F.2d 1375, 1379 (11th Cir.1982)). As we said in *Doe*, "a party may be considered to be 'prevailing' if the litigation successfully terminated by ... [a] mooting of the case where the plaintiff has vindicated his right." 684 F.2d at 1379, *quoted in Martin*, 773 F.2d at 1149. We often describe this class of cases as "catalysts." In these cases, "parties are prevailing if 'their lawsuit was a significant catalytic factor in achieving the primary relief sought through litigation despite failure to obtain formal judicial relief[,]' or 'if their lawsuit is a substantial factor or a significant catalyst in motivating the defendants to end their [unlawful] behavior.'" *Doe*, 684 F.2d at 1380 (citations omitted).

■ We do not regard the mooting of the plaintiffs' APA claim as extinguishing their legal victory for purposes of attorney's fees. As the district court noted, the plaintiffs' objectives were (1) "to stop the mass exclusion hearings which were being held without counsel" and (2) "to obtain the release from detention of class members pending the determination of their political asylum applications." 646 F.Supp. at 1305.

As to the first of these objectives, the district court explained that

> shortly after this case was filed the government conceded that the exclusion orders entered at such hearings were invalid and therefore said orders were vacated.

646 F.Supp. at 1324 n. 2. Under these circumstances, the district court could properly conclude that the plaintiffs "were the prevailing party on this aspect of the case." *Id.*

As to the second of these objectives, it is undisputed that the plaintiffs' lawsuit secured their release; some were returned to detention but only after INS promulgated new regulations. This is apparent from our in banc court's discussion of the mootness issue:

> After the district court rendered its decision, the government promulgated new regulations in accordance with the APA. *See* 8 C.F.R. § 212.5 (1982). At oral argument before this court counsel for petitioners stated that one hundred or more class members are currently being held in detention, but these detainees either had their parole revoked ..., or arrived in this country after the government's promulgation of its new regulations. *Because the government is no longer detaining any class members except pursuant to the new regulations, the APA issue as originally presented has been rendered moot.*

issue was sufficient to make the plaintiffs prevailing parties with regard to the entire lawsuit.

The government also points to the most recent decision in this action, *Jean v. Nelson*, 854 F.2d 405 (11th Cir.1988), as support for its argument that the plaintiffs did not "prevail." In this opinion we instruct the district court to vacate all remaining injunctive relief in favor of the plaintiffs in accordance with our previous *in banc* decision. This new decision adds nothing to the posture of this case.

727 F.2d at 962 (emphasis added). Thus, the claim became moot because the plaintiffs had been released from detention and could not again be detained unless pursuant to duly promulgated regulations regarding parole. Under these circumstances, the district court was authorized to conclude that the plaintiffs were EAJA prevailing parties.

B. *Was the Position of the United States Substantially Justified?*

In *Pierce*, the Supreme Court held that appellate review of the question whether the United States' position is "substantially justified," is subject to an abuse of discretion standard. 108 S.Ct. at 2546-49; *see also Haitian Refugee Center*, 791 F.2d at 1496; *National Treasury Employees' Union v. IRS*, 735 F.2d 1277, 1278 (11th Cir. 1984); *White v. United States*, 740 F.2d 836, 839 (11th Cir.1984); *Ashburn v. United States*, 740 F.2d 843, 846 (11th Cir.1984).

As the Court explained, this question is one which the district courts are " 'better positioned' " to decide. 108 S.Ct. at 2547 (citation omitted).

> To begin with, some of the elements that bear upon whether the Government's position *"was* substantially justified" may be known only to the district court. Not infrequently, the question will turn upon not merely what was the law, but what was the evidence regarding the facts. By reason of settlement conferences and other pretrial activities, the district court may have insights not conveyed by the record, into such matters as whether particular evidence was worthy of being relied upon, or whether critical facts could easily have been verified by the Government. Moreover, even where the district judge's full knowledge of the factual setting can be acquired by the appellate court, that acquisition will often come at unusual expense, requiring the court to undertake the unaccustomed task of reviewing the entire record, not just to

determine whether there existed the usual minimum support for the merits determination made by the fact-finder below, but to determine whether urging of the opposite merits determination was substantially justified.

*Id.*

■ The second standard established by the Court in *Pierce* is the meaning of the term "substantially justified." The Court agreed that the standard of "reasonableness" adopted by the overwhelming majority of circuit courts was the proper one. Thus, to be substantially justified, the United States' position must have a "reasonable basis both in law and fact." 108 S.Ct. at 2550 (citing *Ashburn*, 740 F.2d at 850) (other citations omitted). *See also United States v. Certain Real Estate Property*, 838 F.2d 1558, 1561 (11th Cir.1988); *Stratton v. Bowen*, 827 F.2d 1447, 1449 (11th Cir.1987); *Haitian Refugee Center*, 791 F.2d at 1497.[10]

The *Pierce* court did not fix any precise guidelines for assessing a district court's discretionary review of the reasonableness of the government's position. Factors considered, but held not individually dispositive on the facts in *Pierce*, included: (1) the state at which the litigation was resolved; (2) views expressed by other courts on the merits; and (3) the legal merits of the government's position. 108 S.Ct. at 2551-53. Following the D.C. Circuit, our court has also suggested that the following additional factors assist in the reasonableness inquiry: (1) the clarity of the governing law; (2) the foreseeable length and complexity of the litigation; and (3) the consistency of the government's position. *Haitian Refugee Center*, 791 F.2d at 1497 (citing *Spencer v. NLRB*, 712 F.2d 539, 559-60 (D.C.Cir.1983)). Of course, these guideposts are not intended to be an exhaustive list of all the factors a district court, acting

---

**10.** In an alternative formulation, the Court said that "reasonably justified" also means " 'justified in substance or in the main'—that is, justified to a degree that could satisfy a reasonable person." 108 S.Ct. at 2550. The Court rejected the suggestion, made without elaboration by this court, that the test for reasonableness under the EAJA "is more than mere reasonableness." *Id.* at 2550-51. *See Haitian Refugee Center*, 791 F.2d at 1497; *Stratton*, 827 F.2d at 1449 & n. 3; *Certain Real Estate*, 838 F.2d at 1561 n. 6.

in its discretion, may undertake to review. *Id.*

In disputing the district court's conclusion on the question of substantial justification, the government argues that the district court simply erred with respect to the APA in *Jean I.* Because the questions of law were at least "unsettled," the government contends that it was substantially justified.[11] The government is asking, in essence, that we reweigh the merits of its defense on the APA claim. Two things counsel against such a course. First, this would put us in the position of assessing legal questions that are not before us on the merits. The Supreme Court has explained that under circumstances such as this, an abstract discussion of the law is unwise. Where circuit law is unsettled,

> A ruling that the Government was not substantially justified in believing it to be thus-and-so would (unless there is some reason to think it has changed since) effectively establish the circuit law in a most peculiar, second-handed fashion.

*Pierce,* 108 S.Ct. at 2548. Certain cases will require an appellate court to review the content of the government's legal arguments to determine whether it was substantially justified. *Pierce* was such a case because it focused purely on questions of law. Under these circumstances, it would be useful to examine, for example, the weight of authority on the contested questions; in *Pierce,* the Court conducted such a review. As we will demonstrate, such a review is not necessary in this case.

The second and more important reason for not reopening the merits in this case is that there are sufficient legal and factual indicia upon which the district court relied to support the district court's conclusion that the government's position was not substantially justified.

First, the district court placed particular emphasis on a memorandum that acting General Counsel for INS prepared for the service in early 1981. The memorandum summarized the legal requirements applicable to the defendants' detention policy and mass exclusion hearings. It explained that " '[a]ny change in regulation which takes rights or privileges away from aliens will most likely require a 60–day notice and comment period, and a 30–day delayed effective date....' " 646 F.Supp. at 1326. The district court viewed the defendants' failure to follow this advice as knowing and willful. The court quoted its own review of the evidence on this point in the opinion on the merits:

> "[The defendants] admitted to the Court that they made a conscious effort not to promulgate a rule pursuant to the [APA]. The evidence shows that they never seriously undertook the difficult task of drafting a set of guidelines concerning which aliens would be placed in detention. Instead, INS issued general instructions to its field officers to start detaining excludable aliens...."

646 F.Supp. at 1326 (citation omitted).

In light of the fact that two district judges in the Southern District of Florida had held that APA procedures applied to changes in INS policy toward Haitian refugees, *Sannon v. United States,* 460 F.Supp. 458, 466–67 (S.D.Fla.1978), *remanded to be vacated as moot,* 631 F.2d 1247 (5th Cir.1980); *National Council of Churches v. Egan,* No. 79–2959–Civ–HOEVELER (S.D. Fla. Aug. 3, 1979), the district court concluded that the government's position was unreasonable.

We agree with the government that these two cases, standing alone, would not be dispositive of the reasonableness of its position. Sometimes legal authority against the government on a given legal position will build to such a point that it will be difficult to maintain that the government's continued adherence to that position is reasonable. It will seldom be the case, however, that two district court

---

**11.** The government's posture is succinctly stated in its brief: "The government presented [to the district court] compelling, and in our view, correct arguments that its change in parole practice either did not amount to a 'rule' within the meaning of the APA, or ... that it fell within three exceptions to the APA 'notice and comment' procedure requirements." Brief for the United States at 25.

decisions—even if they appear in the same district in which the relevant case is being litigated—will raise such an obstacle. The government must be permitted to make some strategic choices. It must have the opportunity to make good faith challenges to legal authority with which it reasonably disagrees.

The problem for the government in this case is that INS's acting General Counsel cited one of these district court decisions in forming his opinion that APA procedures were to be followed before INS could substantially alter its detention and parole policies. *Cf. Sannon,* 460 F.Supp. at 466. While the *existence* of this decision is not dispositive, the acting General Counsel's reliance on it is highly significant. The important fact for the district court was that the defendants willfully ignored the advice of counsel. The government's only real response to this point is that the memorandum authored by INS's counsel refers to "regulations," and, impliedly, not to rules. Reply Brief for the United States at 9 n. 8. Of course, the district court held that INS change in policy was a "substantive *rule*" subject to APA rulemaking requirements. 544 F.Supp. at 997. If the government is suggesting that it did not ignore the advice of counsel because the memorandum refers to "regulations" and not "rules," this argument is patently frivolous. *See, e.g.,* K.C. Davis, *Administrative Law Text* § 5.01 at 123 (3d ed. 1972) ("regulation [is] a term used interchangeably with rule").

We conclude that the district court could properly consider the defendants' failure to follow the advice of counsel unreasonable. *Cf. Hudson v. Secretary of Health and Human Services,* 839 F.2d 1453, 1456–57 (11th Cir.1988) (reversing district court finding of substantial justification where agency secretary failed to follow agency regulation).

The district court also explained that the government behaved unreasonably in repeatedly denying—early in the lawsuit—that it had developed any new policy toward Haitians. It claimed instead that "district directors still had complete discretionary authority to parole individuals or, alternatively, that the district directors were merely enforcing the statute." 646 F.Supp. at 1326. According to the district court,

> It was only well into the litigation that the defendants admitted what had been obvious—that there was a detention policy and that they had instituted this policy without complying with rulemaking procedures. Since the plaintiffs had consistently maintained that there was a detention policy, the defendants' unreasonable factual position unnecessarily prolonged the litigation of this matter.

*Id.* Although the government challenges this finding, we conclude that it is supported in the record. The parties' joint pretrial stipulation lists as a *factual* issue for trial the question whether "defendants changed their policy of regularly releasing Haitians to a policy of detention without parole." Given the district court's unique familiarity with the historical consistency of the government's factual position, we conclude that it did not abuse its discretion in finding that the government unreasonably protracted the litigation by failing to acknowledge a change in its parole policy. *See Haitian Refugee Center,* 791 F.2d at 1497.

### III. AMOUNT OF THE AWARD

Although we have concluded that the district court acted within its discretion in making an EAJA award, there remains the question whether the amount of the award was proper. With regard to attorney's fees, the government challenges both the number of reimbursable hours and the hourly rates used by the district court in making its award. The government also challenges the award of costs and expenses, and the award of "fees for fees." In reviewing the district court's calculations, we are again bound to apply an abuse-of-discretion standard. *Pierce,* 108 S.Ct. at 2553 (citing *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983); *Cf. Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 560–61, 106 S.Ct. 3088, 3096, 92 L.Ed.2d 439 (1986)).

## A. *Reimbursable Hours*

The plaintiffs' attorneys prepared documents indicating that they had spent 11,-261.95 reimbursable hours working on this lawsuit. In accordance with earlier guidance given by the district court, the attorneys subtracted a certain number of hours (467.4) from the total for work done on the equal protection claim and reduced by sixty percent the number of hours attributable to their work on the case before the Supreme Court (resulting in a further reduction of 1,604.31 hours). This left a total of 9,190.-24 hours for which the attorneys sought compensation. The district court concluded that the reduction of hours for equal protection work was too low and reduced the total hour figure by an additional fifteen percent. It also concluded that the attorneys could be compensated for only twenty-five percent of the hours spent "at the Supreme Court level." 646 F.Supp. at 1315. This left a total 5,756.84 hours the district court found to be reimbursable. The government has attacked this figure on several grounds.

### 1. Supreme Court Litigation

■ The district court awarded compensation for twenty-five percent of the hours spent litigating the case before the Supreme Court. The only issue before that Court was the merits of the plaintiffs' equal protection claim which was rejected by this court sitting in banc. The Supreme Court *affirmed* our in banc court's judgment, but held that we should not have reached the merits of the constitutional issue. Normally, a prevailing party is entitled to attorney's fees for work done on appeal. *See, e.g., Hutto v. Finney,* 437 U.S. 678, 693–700, 98 S.Ct. 2565, 2574–78, 57 L.Ed.2d 522 (1978) (section 1988); *O'Donnell v. Georgia Osteopathic Hospital, Inc.,* 748 F.2d 1543, 1553 (11th Cir. 1984) (attorney's fees under Fair Labor Standards Act). But that party must also *prevail on appeal* to qualify for appellate attorney's fees. *See, e.g., Bonner v. Coughlin,* 657 F.2d 931, 935–36 (7th Cir. 1981) (section 1988). On its face, the Supreme Court's judgment provides no basis for an award of EAJA fees because there is no question that the plaintiffs did *not* prevail in the Supreme Court.

The district court, however, found that the plaintiffs were entitled to fees for their appeal to the Supreme Court because the government had changed its legal position in that court. According to the district court, the government acknowledged for the first time, in the Supreme Court, that INS regulations prohibited it from using nationality as a factor in making parole decisions. The district court found that "if the government had argued at the District Court and Eleventh Circuit levels the position it took in the Supreme Court, the constitutional claims would not have needed to be litigated." 646 F.Supp. at 1314. This, the district court concluded, provided a basis for EAJA fees for the work performed before the Supreme Court. Assuming the accuracy of the district court's finding regarding a change in the government's position, we nonetheless conclude that the plaintiffs are not entitled to attorney's fees for the Supreme Court litigation. The plaintiffs were seeking a declaration by the Supreme Court that the Constitution prohibits INS from considering race and national origin in making parole decisions. The Court did not reach the question because of the government's concession that 8 C.F.R. § 212.5 is facially a neutral regulation.

Even though the Court found that our in banc court should not have reached the constitutional issue, it did not vacate our opinion; instead, it affirmed our remand to the district court.

The plaintiffs argue that even though the Supreme Court affirmed our in banc court's judgment, they were in fact victorious because the result was a judicial declaration that INS could not discriminate in making parole decisions. We reject this argument for the simple reason that the plaintiffs did not prevail on any legal issue or obtain any additional relief subsequent to our in banc court's decision. We therefore conclude that the district court abused its discretion in compensating them for a portion of the expense of litigating the case at that level. *Cf. Institutionalized Juve-*

*niles v. Secretary of Public Welfare,* 758 F.2d 897, 920 (3d Cir.1985) (ordering disallowance of all hours spent litigating case "after the date on which plaintiffs received their last benefit from the defendants"); *Clark v. City of Los Angeles,* 803 F.2d 987, 993 (9th Cir.1986) (no attorney's fees for appellate work when "nothing associated with the appeal contributed to [the] favorable result achieved by litigation"). On remand, in recalculating the EAJA award, the district court shall exclude any hours spent on Supreme Court litigation.

### 2. Unsuccessful Claims

■■■■ In *Hensley v. Eckerhart,* the Supreme Court held that an award of attorney's fees should be commensurate with the degree of a prevailing party's success. The principles adduced in *Hensley* are generally applicable here:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, ... counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." ...
>
> * * * * * *
>
> In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.
>
> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.
>
> If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.
>
> * * * * * *
>
> There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified.

461 U.S. at 434–37, 103 S.Ct. at 1940–41 (footnotes and citations omitted).

Having reviewed the district court's approach to evaluating the degree of the plaintiffs' success, we conclude that it acted within its discretion and followed generally the Supreme Court's guidance in *Hensley.* It first directed counsel to excise from its fee request those hours spent litigating the equal protection issue. After finding counsel's estimates of the time spent exclusively on this issue "too low," the district court explained its calculation as follows:

> By the Court's estimate, forty percent (40%) of counsel's time was spent on clearly non-equal protection matters.

Perhaps sixty percent (60%) ... was spent on interrelated matters; an insignificant portion of that time was spent on exclusively on equal protection issues. Of the 60% spent on commingled material, the Court estimates that approximately 25% of that time was spent on equal protection issues. Thus, a reduction, of 15% from the total number of hours is in order.

646 F.Supp. at 1315. Here, the "trial court correctly recognized that the fee award should exclude the time spent on [the] unsuccessful claim[ ] except to the extent that such time overlapped with related successful claims." *Trezevant v. City of Tampa,* 741 F.2d 336, 341 (11th Cir.1984).

The government argues that further reductions were in order because the factual overlap between the APA and equal protection claims were less substantial than the district court found. The government has provided us with no basis, however, to discern the degree to which it believes the district court abused its discretion. In contrast, the plaintiffs have supplied us with numerous citations to the record from the attorney's fees proceedings which indicate that the district court had adequate information to support a finding that the legal and factual issues did overlap substantially. The government would also have us order a reduction of the total hour figure on the ground that the plaintiffs obtained "limited" success. As we explained above, we do not think this case is one in which the victory secured was merely technical or formalistic. The plaintiffs obtained the relief they sought in their lawsuit, although not in the form of a declaration that the government had violated the Constitution. If the hours spent litigating the constitutional issues were properly deducted by the district court, there is no reason to further reduce the award.

### 3. Documentation and Duplication of Effort

 Given the detailed record in the fee proceedings, we also reject the government's contention that the attorney's fees requests were not supported by sufficient documentation. The government's princi-

pal complaint in this regard is that several of the fee applications were in part the product of "reconstructed" time records. Recently, a number of courts have announced *prospective* rules requiring the filing of contemporaneous records to support an application of attorney's fees. *See Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984); *Ramos v. Lamm,* 713 F.2d 546, 553 (10th Cir.1983); *New York State Association for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1147 (2d Cir.1983). Our court, however, has held that contemporaneous time records are not indispensable where there is other reliable evidence to support a claim for attorney's fees. *Johnson v. University College,* 706 F.2d 1205, 1207 (11th Cir.), *cert. denied,* 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983); *see also Dennis v. Warren,* 779 F.2d 245, 249 (5th Cir.1985); *Bonnette v. California Health & Welfare Agency,* 704 F.2d 1465, 1473 (9th Cir.1983). The government has pointed to no particular fee record considered by the district court which was so unreliable as to require that the district court reject it as a basis for part of the award. We find nothing to indicate that the district court abused its discretion in relying in part on reconstructed time records.

 We likewise reject the government's contention that counsels' hours were subject to reduction as a result of unnecessary duplication of their efforts. The government asserts that lead counsel in Miami failed to oversee and coordinate the work performed by New York co-counsel and that this resulted in unnecessary duplication of attorney effort. The district court carefully considered the question of undue duplication and found credible counsels' representations that they had "purged" their time sheets of unnecessary duplication. 646 F.Supp. at 1314. Our court has recognized that the retention of multiple counsel in complex cases is "understandable and not a ground for reducing the hours claimed" because "[t]he use in involved litigation of a team of attorneys who divide up the work is common for both plaintiff and defense work." While dupli-

cation of effort is a proper ground for reducing a fee award, "a reduction is warranted only if the attorneys are *unreasonably* doing the *same* work." *Johnson*, 706 F.2d at 1208. Again, the government has pointed to no specific instances in which counsels' work was unreasonably duplicative. We find that the district court did not abuse its discretion in this regard.

### B. *Hourly Rates*

In arriving at its attorney's fee figures, the district court began by considering the factors enumerated by this court in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). The *Johnson* factors, first developed in the Title VII context, constitute one widely accepted mechanism for calculating attorney's fees. Because many of the *Johnson* factors are subsumed into the initial calculation of an attorney's fees lodestar (reimbursable hour multiplied by hourly rate), the Supreme Court has expressed some criticism of the *Johnson* approach in dicta. *See Hensley v. Eckerhart*, 461 U.S. at 435 n. 9, 103 S.Ct. at 1940 n. 9. Nonetheless, this court has held that the factors enumerated in *Johnson* are to be considered in calculating EAJA fees. *See Florida Suncoast Villas, Inc. v. United States*, 776 F.2d 974, 975 (11th Cir.1985) (*Johnson* factors play a role in arriving at reasonable EAJA fee).

██ The Supreme Court's *Pierce* opinion has led us to reappraise this approach, and focus instead on the language of the Act. The EAJA provides that "fees awarded ... shall be based upon prevailing market rates for the kind and quality of the services furnished," but "shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A). As the statute indicates, a court's starting point should be not the *Johnson* factors but the "prevailing market rates" for services of like quality and kind. Market rates for legal services being what they are, these rates will exceed the EAJA's $75

cap in many cases. But this fact alone does not authorize a court to make an upward adjustment in hourly rates. As the Court explained in *Pierce*, the EAJA's special factor formulation "suggests Congress thought that $75 was generally quite enough public reimbursement for lawyers' fees, whatever the local or national market might be." 108 S.Ct. at 2554.

On remand, the district court must first determine the prevailing market rates for services of the kind and quality provided. This inquiry will typically focus on affidavits or testimony of similarly situated practitioners, who are uniquely qualified to express opinions as to "what the market will bear." The fee requests in this case ranged from $40 per hour for paralegal time to $175 per hour for experienced counsel. If these requests accurately reflect prevailing market rates, the district court must still find that a cost of living increase or a "special factor" justifies hourly rates of more than $75 before it can award fees at a rate in excess of this figure. *See, e.g., Hyatt v. Heckler*, 807 F.2d 376, 382–83 (4th Cir.1986) (although expert testimony proved that prevailing market rate was $125, district court properly reduced rate to $75), *cert. denied*, —— U.S. ——, 108 S.Ct. 79, 98 L.Ed.2d 41 (1987).

### 1. Cost of Living

██ In its EAJA award, the district court cited the statutory cost of living increase permitted by the EAJA as a ground for upward adjustment. The court failed, however, to specify in dollar amounts the impact of this factor in reaching its overall award. A case of this duration and complexity will make it difficult to make cost of living adjustments with absolute precision. Nonetheless, a court should describe mathematically the basis of all cost of living adjustments under the Act. On remand, the district court shall quantify and explain all cost of living adjustments in favor of each of the plaintiffs' attorneys.

██ We consider one more question regarding cost of living adjustments. The 1985 enactment of the EAJA contains the same $75 hourly figure found in the origi-

nal, 1980 version of the Act. Recently, a question has arisen as to whether Congress intended to "restart the clock" on cost of living adjustments by retaining the $75 cap. One circuit court has so held. *See Chipman v. Secretary of Health & Human Services,* 781 F.2d 545, 547 (6th Cir. 1986) (given retention of $75 figure, court does not abuse discretion in failing to make adjustment for pre–1985 services). The government has urged us to adopt this position and hold that no cost of living adjustment can be made for legal services performed prior to the effective date of the 1985 version of the Act. Instead, we join the growing number of circuit courts which have held that the EAJA's 1985 reenactment does not bar cost of living adjustments for services rendered prior to 1985. *See Trichilo v. Secretary of Health & Human Services,* 823 F.2d 702, 706–07 (2d Cir.1987); *Allen v. Bowen,* 821 F.2d 963, 967 (3d Cir.1987); *Sierra Club v. Secretary of the Army,* 820 F.2d 513, 520–23 (1st Cir.1987); *Hirschey v. FERC,* 777 F.2d 1, 5 (D.C.Cir.1985).

### 2. Special Factors

 The district court adjusted the hourly rates of plaintiffs' counsel on the basis of the only "special factor" named in the EAJA, "the limited availability of qualified counsel." In *Pierce,* the Supreme Court gave this phrase a rather limited construction in light of the EAJA's $75 cap. The Court explained that

"limited availability of qualified attorneys for the proceedings involved" must refer to attorneys "qualified for the proceedings" in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having *some distinctive knowledge or specialized skill* needful for the litigation in question—as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation. Examples of the former would be

an identifiable practice specialty such as patent law, or knowledge of foreign law or language. Where such qualifications are *necessary* and can be obtained only at rates in excess of the $75 cap, reimbursement above that limit is allowed.

108 S.Ct. at 2554 (emphasis added). The Court's view is clear: a mere short supply of qualified lawyers willing to take a case for $75 per hour or less does not mean that there is a "limited availability of qualified counsel."

 In addition, where highly skilled lawyers or lawyers with the best reputations participate, this is not a factor to be considered once it is established that market rates for their services exceed $75. Under such circumstances only a special skill authorizes an upward adjustment of hourly rates. From the district court's order, we perceive only two grounds for which a rate adjustment might be proper on the basis of special factors. First, some of the participating attorneys have a special expertise in immigration law. This is narrow legal specialty which might entitle them to an adjustment if market rates for their services exceed $75. *Cf. Hoopa Valley Tribe v. Watt,* 569 F.Supp. 943, 947 (N.D.Cal.1983) (increased hourly rates for expert in native American law). Second, at least one of the plaintiffs' attorneys is fluent in French and Haitian Creole. According to the district court "her language abilities were crucial to her work in communicating with and preparing the testimony of Haitian plaintiffs and witnesses." 646 F.Supp. at 1312. If prevailing market rates for her services exceed $75—something which is not readily apparent since her initial fee request was based on a $75 per hour rate—she might be entitled to an increased hourly rate. On remand, the court shall consider whether either of these factors are "special" for EAJA purpose and entitle the relevant attorneys to increased hourly rates.[12]

---

**12.** The dissent contends that attorneys practicing immigration law do not have any "distinctive knowledge or specialized skill *needful for the litigation in question"* within the meaning of that phrase as it is used in *Pierce,* 108 S.Ct. at

2554 (emphasis added). The majority agrees that not every immigration attorney or every immigration lawsuit warrants an upward adjustment of hourly rates and we would suggest that such is also the case in some patent or

### 3. "Enhancement"

■ The district court enhanced the overall fee award of each attorney for the plaintiffs who was awarded fees. The court assumed that the limited circumstances in which the Supreme Court has authorized lodestar adjustments applied to EAJA cases. *See, e.g., Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (modification proper only in rare and exceptional cases) (citing *Blum v. Stenson,* 465 U.S. 886, 889, 104 S.Ct. 1541, 1549, 79 L.Ed.2d 891 (1984)). In light of the Court's second *Delaware Valley Citizens' Council* decision, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), decided after the district court made its award, the legal status of all enhancements and multipliers in cases concerning fee-shifting statutes is unclear. One thing, however, is certain. Given that the EAJA constitutes a partial waiver of the United States' immunity, the Act must be strictly construed. If the award made by a court is to be based on rates in excess of the figure provided by the Act, it must be because the Act permits it. *Library of Congress v. Shaw,* 478 U.S. 310, 318, 106 S.Ct. 2957, 2963, 92 L.Ed.2d 250 (1986) (waiver must be construed strictly in favor of sovereign and not enlarged beyond what the language requires). Under the statute, only special factor adjustments and cost of living adjustments are authorized. Blanket enhancements are not authorized. Nonetheless, we will consider whether the factors relied upon in enhancing the overall fee awards can qualify as special factors within the meaning of the EAJA.

### a. Pro Bono Publico

The district court held that because the plaintiffs' attorneys were motivated by concern for the plight of Haitian refugees and not pecuniary self-interest, they were enti-tled to an increased award. Plaintiffs' counsel are to be lauded for their efforts on behalf of the indigent and those they believed were wrongfully oppressed. But the EAJA does not distinguish between the selfless lawyer and the selfish one. We hold that neither the personal motivations of attorneys acting *pro bono publico,* nor the *pro bono* nature of a case, presents an EAJA "special factor." *Cf. Pierce,* 108 S.Ct. at 2554 (both contingent fee arrangement and undesirability of a case are too broad and general for either to be considered a "special factor").

### b. Vindication of Public Rights

The district court enhanced the fee awards because counsel had acted as "private attorney generals seeking to vindicate public rights." 646 F.Supp. at 1317–18. While we agree that such actions are to be commended, for the reasons just discussed, this consideration cannot support an award exceeding the statutory cap. In many cases where EAJA fees may be awarded, the party opposing the government seeks to force compliance with federal law. In a narrow sense, these cases will always involve a vindication of "public" rather than purely "private" rights.

Permitting adjustment of hourly rates on this ground would therefore contravene the Supreme Court's view that "special factors" must not be "of broad and general application." *See* 108 S.Ct. at 2554.

### c. The Emotional Hardship to Plaintiffs' Counsel

The district court acknowledged, and we do not dispute, that this case imposed unique pressures on counsel for the plaintiffs. Trial evidence established that many of the plaintiffs sustained severe psychological problems as a result of their prolonged detention. Family members were isolated. Some members of the class com-

foreign law cases. Lawyers and judges could spend the balance of time arguing about the meaning and scope of the above-quoted phrase from *Pierce.* Interpretation of this phrase is better left to the discretion of the district court as application of the phrase will necessarily depend on the complexity of the case ("the liti-gation in question") and on the experience ("distinctive knowledge") and acquired expertise ("specialized skill") of the particular billing attorney. We are confident that the district court can properly interpret and apply the above-quoted phrase to the facts of this case.

mitted suicide. The court understands the sense of urgency experienced by counsel who seek to secure the release of persons from detention believed unlawful. We also acknowledge that the best of lawyers understand, sympathize with, and act upon the real hardships experienced by their clients. By all accounts, the highly motivated counsel for the plaintiffs upheld the highest standards of the legal profession in this regard. Yet, we must again conclude, in light of *Pierce*, that meeting the unique emotional burdens in this case constituted one of the many features of this case which might increase our esteem for the lawyers involved but does not constitute a special factor under the EAJA. *Cf. Pierce*, 108 S.Ct. at 2554 (undesirable cases do not, by themselves, give rise to special factors).

### d. The Government's Litigious Position

The district court was clearly disturbed by the United States' general posture in this litigation:

> The government took an unusually unwavering and litigious position throughout the litigation. Many of the government's contentions and litigating postures were unwarranted and unnecessarily prolonged the litigation. The government used all of its considerable resources in opposing Plaintiffs' contentions at every turn. From pretrial discovery, through trial and successive appeals, the government moved for stays of Court Orders, forced repeated applications for emergency relief, put Plaintiffs in a posture requiring a brief on all pleaded issues, on every motion, and opposed, in fact as well as law, each and every important issue asserted by Plaintiffs.

646 F.Supp. at 1318. We have no quarrel with the district court's observations, that court being uniquely situated to observe the conduct of the lawsuit. *Pierce* gives little guidance as to what can constitute a special factor except for its discussion of certain adjustments specifically discussed as not being "special factors." As with the establishment of a standard to test the question of substantial justification, the Court appears to have recognized that judicial construction of the "special factor" term is likely to evolve with time. Thus, on remand, the district court should be free to approach this question anew, and consider potential special factors that would be consistent with *Pierce* and our discussion here, including whether the government's unusually litigious position in this case might constitute a special factor.[13] The court should remember, however, that nothing "routine" or "generally applicable" to a "broad spectrum of litigation" can count. *See* 108 S.Ct. at 2553.

### C. Other Components of the Award
#### 1. Costs

■ The EAJA authorizes the recovery of three types of litigation expenditures. First, under 28 U.S.C. § 2412(a), a prevailing party opposing the United States in "any civil action" "may be awarded" costs as delineated in 28 U.S.C. § 1920. The second and third types of expenditures in-

---

13. For example, under Rule 11 courts are required to distinguish between contentions that often have no "reasonable basis in law or fact" and those also injected without any purpose but to harrass. *See generally* Fed.R.Civ.P. 11 advisory committee's note. Sanctions under Rule 11 are meant to eliminate frivolity *and* harrassment, not attorney zealousness. *Id. See also Golden Eagle Distributing Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1540 (9th Cir.1986). As the dissent points out, the EAJA already requires that the government's position have no "reasonable basis in law and fact" as a condition precedent to the recovery of fees. The EAJA does not, however, protect a litigant against potential government harrassment. It is easy to imagine a situation where a position that is not "substantially justified" is exacerbated by im-

proper purposes in defending the lawsuit. For instance, if the government were aware that the cost of doing business of certain of the plaintiffs' attorneys exceeded the EAJA cap of $75.00 per hour, the government might adopt an aggressive, litigious strategy in order to deter the plaintiffs' attorneys by actually forcing these attorneys to operate at a loss. We do not suggest that this situation occurred, but it is illustrative of how an improper purpose can be a factor that is additional to a "frivolous" position. Thus, if the government in this case advanced litigation for any improper purpose such as harrassment, unnecessary delay or increase in the plaintiffs' expense, then consistent with *Pierce*, its action warrants the imposition of a special factor.

cluded in the statute are "fees and other expenses," which a district court must award to a party who prevails against the United States in "any civil action (other than cases sounding in tort)" when the government fails to demonstrate that its position was substantially justified. 28 U.S.C. § 2412(d)(1)(A).

The government contests the district court's award of certain litigation expenditures that the district court found to constitute "fees and other expenses." The Act provides a partial definition of these terms:

"fees and other expenses" include the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project *which is found by the court to be necessary for the preparation of the party's case,* and reasonable attorney's fees ...;

28 U.S.C. § 2412(d)(2)(A) (emphasis added). The government argues that these terms must be given a limited construction since the EAJA represents a waiver of the United States' sovereign immunity. The problem with this interpretation is that "fees" and "expenses" are defined in the Act by example, rather than by limitation. In this regard, we agree with the following observations by Chief Judge Alaimo of the Southern District of Georgia:

Turning ... to the structure of the definitions contained in the EAJA, it appears that where the drafters used the word "includes" they intended to provide a *non-exhaustive* list of examples to clarify the meaning of the term. For example, § 2412(d)(2)(G) provides that " 'court' *includes* the United States Claims Court," (yet that section may not be interpreted to mean that *this Court* would not meet the statutory definition); likewise, in § 2412(d)(2)(C), " 'United States' *includes* any agency and any official of the United States acting in his or her official capacity." Where Congress intended a more exclusive definition, it used the word "means," as in § 2412(d)(2)(B), Where "party" *means* an individual with the appropriate net worth. Several circuits have construed "fees and other expenses" to encompass

"costs that are ordinarily billed to a client." *International Woodworkers of America v. Donovan,* 769 F.2d 1388, 1392 (9th Cir.1985) [*opinion amended,* 792 F.2d 762 (9th Cir.1985)]; *Aston v. Secretary of Health and Human Services,* 808 F.2d 9, 12 (2d Cir.1986). The Court agrees with the conclusion of these cases that the list of expenses provided in § 2412(d)(2)(A) was not meant to be all-inclusive.

*City of Brunswick v. United States,* 661 F.Supp. 1431, 1444–45 (S.D.Ga.1987) (emphasis in original), *rev'd on other grounds,* 849 F.2d 501 (11th Cir.1988).

Although some circuits have read this provision more restrictively, they have done so largely without analysis or for reasons with which we disagree. *See Wyandotte Savings Bank v. NLRB,* 682 F.2d 119 (6th Cir.1982); *Action on Smoking and Health v. C.A.B.,* 724 F.2d 211, 223–24 (D.C.Cir.1984); *Weakley v. Bowen,* 803 F.2d 575, 580 (10th Cir.1986). *Wyandotte* suggests that no litigation expenditure (other than attorney's fees) is recoverable under the EAJA unless it is one of the costs enumerated in 28 U.S.C. § 1920. *See* 682 F.2d at 120. This approach reads key language out of the Act. Section 2412(d)(1)(A) provides that "fees" and other "expenses" are awarded *"in addition to* any costs awarded pursuant to subsection (a)," the subsection treating section 1920 costs. *Action on Smoking,* without analysis, holds that the EAJA does not authorize an award for expenses similar to those awarded in this case. 724 F.2d at 223–24. It relies instead on *NAACP v. Donovan,* 554 F.Supp. 715, 719 (D.C.Cir.1982). The *NAACP* opinion, however, reads the Act to authorize only those "expenses" listed in subsection 2412(d)(2)(A) or those of a like nature. We will not apply the rule of statutory construction known as *ejusdem generis* in this case for the reasons given by Judge Alaimo in *City of Brunswick. Weakley* is unhelpful because it relies totally on *Wyandotte* and the D.C. Circuit's rulings on the matter.

An examination of the nature of the expenses listed in the Act reinforces our read-

ing of it. Items such as engineering reports and studies are extraordinary expenditures not commonly necessary to the preparation of a lawsuit. By including these unusual items in the list of reimbursable expenses, Congress enlarged, rather than contracted, the category of expenditures that are reimbursable under the EAJA. Thus, we reject the government's argument that telephone, reasonable travel, postage, and computerized research expenses are not compensable under the EAJA. *See International Woodworkers of America v. Donovan*, 792 F.2d 762, 767 (9th Cir.1985) (expenses routinely billed to a client—telephone, air courier, attorney travel—are recoverable under the EAJA); *Aston v. Secretary of Health and Human Services*, 808 F.2d 9, 12 (2d Cir.1986) (affirming award of telephone, postage, travel and photocopying expenses).

The limitation on the amount and nature of such expenses is that they must be "necessary to the preparation of the [prevailing] party's case." 28 U.S.C. § 2412(d)(2)(A). "In contrast, expenses of an attorney that are not incurred or expended solely or exclusively in connection with the case before the court, or which expenses the court finds to be unreasonable or unnecessary in the pending litigation, cannot be awarded under the EAJA." *Oliveira v. United States*, 827 F.2d 735, 744 (Fed.Cir.1987). We hold that the challenged expenses may be reimbursed under the EAJA.

### 2. Paralegal and Law Clerk Time

■ The district court awarded reimbursement for time spent by paralegals and law clerks where the work was that normally done by an attorney. The hourly rate awarded was $40. This is the rate at which the law firm whose paralegals and clerks were involved bills its clients. The government challenges the rate awarded, and contends that paralegal time is recompensable only at the actual cost to the plaintiffs' counsel. In the context of a Title VII case, we have held that paralegal time is recoverable as "part of a prevailing party's award for attorney's fees and expenses, [but] *only to the extent that the paralegal performs work traditionally done by an attorney.*" *Allen v. United States Steel Corp.*, 665 F.2d 689, 697 (5th Cir. Unit B 1982). The same analysis applies here. To hold otherwise would be counterproductive because excluding reimbursement for such work might encourage attorneys to handle entire cases themselves, thereby achieving the same results at a higher overall cost. *See Berman v. Schweiker*, 531 F.Supp. 1149, 1154–55 (N.D.Ill.1982), *aff'd*, 713 F.2d 1290 (7th Cir. 1983). We affirm the award of law clerk and paralegal fees.

### 3. Fees for Fees

■ The last question we consider is whether the district court erred in awarding attorney's fees for the fee litigation without first determining that the government's position in the fees proceedings was without substantial justification. The district court relied on a statement in *Haitian Refugee Center v. Meese*, 791 F.2d 1489, 1500 (11th Cir.1986), which lends support to this approach. As the government notes in its brief, however, that portion of *Haitian Refugee Center* upon which the district court relied, was later vacated by the *Haitian Refugee Center* panel. 804 F.2d 1573, 1574 (11th Cir.1986).

Those circuits that have discussed the question of "fees for fees" in the EAJA context are divided. Two circuits have indicated that a successful EAJA fee applicant should not recover attorney's fees associated with litigating the fee issues unless the government's position in the attorney's fee litigation is not substantially justified. *See Rawlings v. Heckler*, 725 F.2d 1192, 1196 (9th Cir.1984) (no fees for defending EAJA award on appeal if government's appellate position is reasonable); *Russell v. National Mediation Board*, 775 F.2d 1284, 1285, 1291 n. 8 (5th Cir.1984) (no fees for fee application where agency defense to award was partially meritorious).

The D.C. Circuit has recognized a substantial difficulty with this approach:

[I]f we require every victorious EAJA plaintiff to make a separate claim for

fees for bringing the first EAJA suit, and permit the government to claim that its first EAJA defense was substantially justified on the merits, we face the distinct possibility of an infinite regression of EAJA litigation. A successful EAJA plaintiff will bring another suit claiming fees for bringing the EAJA suit, and the government will defend on the ground that its EAJA defense was substantially justified. If the plaintiff wins this suit, yet a third suit will be required to recover fees for the second suit recovering fees. And if the government contests this suit and loses, yet a fourth suit will have been spawned, and so on. In our opinion the *per se* fee-shifting rule is the least objectionable exit from this Kafkaesque judicial nightmare; in most cases a loss on the generous "substantially justified" EAJA threshold strongly indicates that the government is clinging to an unreasonable position.

*Cinciarelli v. Reagan,* 729 F.2d 801, 810 (D.C.Cir.1984) (footnote omitted). The D.C. Circuit did not squarely hold, however, that successful EAJA fee applicants are automatically entitled to "fees for fees." In a subsequent case, it has held that the government may raise certain technical defenses, such as an untimely filing by the fee applicant, and defend against an application for "fees for fees" on the ground that the technical defense is substantially justified. *American Academy of Pediatrics v. Bowen,* 795 F.2d 211, 214 (D.C.Cir. 1986).

The Third Circuit has adopted still a different approach. Where "the sole basis for the opposition [to EAJA fees] is the alleged substantial justification of the government's position in the underlying proceedings," the fee applicant "will almost always, if not always, be entitled to fees for litigation over an EAJA fee petition if she is entitled to fees for the underlying litigation." Yet where the government's opposition to EAJA fees is based on other contentions, "an application for fee petition expenses can present issues not resolved by the proceedings on the original fee petition." *Russell v. Heckler,* 814 F.2d 148, 155 (3d Cir.1987), *vacated on other*

*grounds,* — U.S. —, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) (for reconsideration of attorney's fees in light of *Pierce* ). As to these issues, the Third Circuit grants the government the opportunity to defend its position as substantially justified. *Id.*

Only the Second Circuit has held that the government's position in the fee litigation is irrelevant to a determination whether a successful EAJA fee applicant can claim "fees for fees." As Judge Pratt explained for the court,

> To begin with, the very purpose of the EAJA is to ensure that persons aggrieved by unreasonable governmental actions are not prevented from vindicating their claims by the potentially high costs involved in doing so. Since the statute primarily assures prevailing plaintiffs their reasonable attorney's fees, it would be ironic if claiming those very fees—which would have been unnecessary if not for the government action—was the one act for which a claimant could not receive compensation. Since the purpose of the EAJA is to remove counsel fees as an impediment to challenging unreasonable and unjustified governmental actions, where a governmental action has been known to have been unjustified, there should be as little disincentive for plaintiffs to obtain attorney's fees as there is for them to challenge the action itself. The government asks us "to treat the EAJA application as part of counsel's cost of doing business." To do so, however, would leave it in the power of the government, which already had been unjustified in its actions toward plaintiff, to so raise the cost of plaintiff's counsel's "doing business" simply by strenuous resistance to all fee applications as to discourage or economically prevent a plaintiff from litigating against the government in the first place. We regard it as more consistent with the congressional purpose to treat plaintiff's fee application as part of the government's cost of taking positions that are not substantially justified.

*Trichilo v. Secretary of Health and Human Services,* 823 F.2d 702, 707 (2d Cir.

1987). We agree with these sound reasons for awarding "fees for fees." It would contravene Congress's purpose in passing the EAJA to require under all circumstances that successful EAJA fee applicants bear the costs of obtaining EAJA fees. This court has already indicated that attorney's fees incurred defending an EAJA award on appeal, or appealing a denial of EAJA fees, are recoverable as part of the final fee award. *Hudson v. Secretary of Health and Human Services*, 839 F.2d 1453, 1458 n. 7 (11th Cir.1988). *See also Trichilo v. Secretary of Health and Human Services*, 832 F.2d 743 (2d Cir.1987). We agree with the D.C. Circuit that a fixed rule permitting infinite litigation of the substantial justification question would make for unwise judicial policy. We hold, therefore, that the United States may not oppose a "fees for fees" request solely on the ground that its position in the fee litigation was substantially justified.[14]

## IV. CONCLUSION

To summarize, we hold that the district court acted within its discretion in determining that the government's position in the underlying litigation was not substantially justified but that the case must be remanded for recalculation of attorney's fees and expenses in accordance with this opinion.

**AFFIRMED IN PART, VACATED AND REMANDED.**

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I, II, III A and C of the majority's opinion. The majority, however, permits an award of fees in excess of the $75 statutory cap for three reasons with which I disagree; I therefore respectfully dissent from Parts III B and IV.

First, I do not agree that the award of cost-of-living adjustments for services rendered prior to 1985 is permissible. In 1985, Congress provided that "attorney fees shall

not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living ... justifies a higher fee." Assuming Congress meant what it said, Congress considered $75 per hour reasonable compensation given the cost of living in 1985. With a positive rate of inflation (*see Hirschey v. F.E.R.C.*, 777 F.2d 1, 5 n. 24 (D.C.Cir.1985)), $75 was *a fortiori* reasonable compensation given the cost of living in the years 1980 through 1984.

The Second Circuit in *Trichilo v. Secretary of Health and Human Services*, 823 F.2d 702 (2d Cir.1987), rejected this interpretation "as contrary to the legislative intent, unjustified under tenets of statutory construction, and inevitably bound to lead to incongruous results." *Id.* at 705. The court cited language in the statute providing that the Equal Access to Justice Act " 'shall be effective on or after the date of the enactment of this Act *as if [it] had not been repealed.'* " *Id.* (emphasis in original). In my view, however, these general words do not sanction disregard of particular language setting the cap at $75 per hour. *Cf. Estate of Flanigan v. Commissioner*, 743 F.2d 1526, 1532 (11th Cir.1984).

Exercising insight into the congressional decisionmaking process, the *Trichilo* court opined that Congress "made no decision that $75, measured in 1985 dollars, was still an appropriate cap...." 823 F.2d at 705. The court also noted that it was not "told why the 1985 congress, obviously concerned ... about inflation ..., would want to ignore the inflation that had occurred between 1981 and 1985." *Id.* at 706. *See also Allen v. Bowen*, 821 F.2d 963, 967 (3d Cir.1987) (legislative history does not suggest that Congress's "decision not to raise the $75 flat hourly rate was in any way indicative of its desire to reduce the cost of living adjustment"). One answer to the *Trichilo* court's query is that Congress has no duty to explain itself. Moreover, Congress in 1985 still may have felt that $75 an hour was a reasonable rate for the public

---

**14.** We express no opinion as to whether a "technical defense" exception to this rule should exist

as the government has not briefed the issue.

funding of lawsuits, notwithstanding any concern for inflation.

Courts relaxing the cap have referred to the sound principle that Congress is presumed to be aware of prior judicial constructions of its statutes. *Trichilo,* 823 F.2d at 706; *Sierra Club v. Secretary of the Army,* 820 F.2d 513, 522 (1st Cir.1987). Invoking this principle does not, however, counter the possibility that by the very act of preserving the $75 cap, Congress evidenced an intent to modify the applicability of prior judicial decisions.

Courts also advance the time-honored "absurd result" argument in support of a holding that cost-of-living adjustments prior to 1985 are permissible. *Trichilo,* 823 F.2d at 706–07; *Sierra Club,* 820 F.2d at 523. I find it plausible that Congress struck a balance between attorney compensation and concerns over an ever-increasing federal budget deficit. *See Pierce,* 108 S.Ct. at 2554 ("Congress thought that $75 an hour was generally quite enough public reimbursement for lawyers' fees, whatever the local or national market might be"). Such a compromise may have been necessary in order to insure the re-enactment of the Equal Access to Justice Act. If so, the $75 cap represents a reasonable political compromise not open to judicial "interpretation." *Cf. Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837, 865–66, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984). But if no such balance was struck, and Congress in fact erred, the problem is for Congress, not the courts, to remedy.

Second, I also disagree with the majority's holding that a lawyer specializing in immigration law may possess a special skill entitling him to increased fees. The depths of fourth-amendment law or first-amendment law, for example, are no less murky than the recesses of immigration law. With the precedent of the majority opinion, district courts will find it difficult to identify a legal specialty that does not justify an increase.

In its discussion of "special factors," the *Pierce* Court stated:

> We think [the phrase] refers to attorneys having some distinctive knowledge or specialized skill needful for the litigation in question—as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation. Examples of the former would be an identifiable practice specialty such as patent law, or knowledge of foreign law or language.

108 S.Ct. at 2554. Patent law and foreign law are narrow areas of specialization that generally require learning not common to lawyers in the United States. By contrast, competence in immigration law requires no peculiar base of knowledge; an attorney with a reasonable amount of "general lawyerly knowledge and ability" can learn immigration law. Allowing a premium for knowledge of immigration law therefore runs counter to the Supreme Court's counsel to "preserve the intended effectiveness of the $75 cap." *Id.*

Finally, I question whether the government's "litigious position" may properly constitute a "special factor." The district court described the government's posture as follows:

> Many of the government's contentions and litigating postures were unwarranted and unnecessarily prolonged the litigation. The government used all of its considerable resources in opposing Plaintiff's contentions at every turn. From pre-trial discovery, through trial and successive appeals, the government moved for stays of Court Orders, forced repeated applications for emergency relief, put Plaintiffs in a posture requiring a brief on all pleaded issues, on every motion, and opposed, in fact as well as law, each and every important issue asserted by Plaintiffs.

646 F.Supp. at 1318. The majority opinion instructs the district judge to take a fresh look at whether this behavior constitutes a "special factor," advising that nothing "routine" or "generally applicable" to a "broad spectrum of litigation" can count (citing *Pierce,* 108 S.Ct. at 2554), but suggesting that "[i]t is easy to imagine a situation where a position that is not 'substantially justified' is exacerbated by improper

purposes in defending the lawsuit." *Ante* note 13.

Certainly, government lawyers should be no less zealous than private lawyers. As outlined by the district court, the attorneys were simply making full use of available process to advance the interests of their client, the United States. I see no reason why attorney zeal should be a "special factor," for Congress surely anticipated the zeal of its own lawyers when it set the $75 cap. Moreover, as a finding that the government's position had no "reasonable basis both in law and fact" is a condition precedent to every EAJA award, allowing a premium based on the government's "contentions and litigating postures" will likely lead courts to double-count the substantial-justification factor. Rule 11 sanctions are always available to compensate "a litigant whose opponent acts in bad faith in instituting or conducting litigation." Fed.R. Civ.P. 11 advisory committee's note.

As I would hold that premiums in excess of $75 per hour are not available for inflation prior to 1985, for knowledge of immigration law, or for the government's posture in litigation, I respectfully dissent from Parts III B and IV of the court's opinion.